STATE OF MINNESOTA *ex rel.* H. W. CHILDS, Atty. Gen., *vs.* OSCAR E. HOLMAN *et al.*

Argued June 27, 1894. Demurrer sustained July 14, 1894.

No. 8963.

**St. Paul city charter construed.**

The provision of the charter of the city of St. Paul (Sp. Laws 1891, ch. 6, § 1) that, of the members of the assembly to be elected at large from the body of electors of the city, four shall reside east of Wabasha and Rice streets and north of the Mississippi river, four west of Wabasha and Rice streets and north of the Mississippi river, and one in the sixth ward, relates to their eligibility or qualification for election, and not to where they shall reside after election.

**Constitution, Art. 7, § 7, applies to municipal offices.**

The constitution of the state, Art. 7, § 7, providing that every person entitled to vote at any election shall be eligible to any office elective by the people in the district wherein he shall have resided thirty days previous to such election, applies to statutory (including municipal) as well as constitutional offices.

**The Legislature can not prescribe additional qualifications.**

Where the constitution prescribes the qualifications for eligibility to office, it is not in the power of the legislature to add any additional qualifications, or to impose any limitations upon the terms of eligibility fixed by the constitution.

**St Paul city charter in this respect is invalid.**

The provision of the city charter referred to is in this respect in conflict with the constitution.

CANTY, J. dissenting.

*H. W. Childs,* Attorney General, by leave of this court, presented an information stating that at a municipal election held in the City of St. Paul on May 1, 1894, under Sp. Laws 1891, ch. 6, for the election of nine assemblymen at large to the common council of the city, thirty six persons were candidates. That of these Wm. Banholzer received 11,199 votes, Oscar E. Holman 11,112, Timothy Reardon 11,291, and O. H. Arosin 11,294, that seven others had more votes than any one of these four. That the votes were duly canvassed, and the seven, together with Banholzer and Holman, were declared elected. That Banholzer and Holman took the oath of office and wrongfully and unlawfully without color of right or title

thereto intruded into and usurped the offices of assemblymen of said city, and he prayed that a writ issue to them to appear and show *quo warranto* they and each of them hold and exercise said offices. Banholzer and Holman answered that by Sp. Laws 1891, ch. 6, four of the said nine assemblymen shall reside in that part of the city east of Wabasha and Rice streets and north of the Mississippi river, and four west of said streets and north of the river, and one in that part south of the river known as the sixth ward. That at said election J. J. Parker, Oscar E. Holman and Wm. Banholzer, democrats, and W. R. Johnson, republican, resided in the west division north of the river, and each received more votes than any other person residing in that division and were thereby duly elected. That they qualified and entered upon the discharge of the duties of assemblymen and are still of right holding the two offices. To this answer the Attorney General demurred.

· *H. W. Childs,* Attorney General, and *W. H. Lightner,* for the relator.

By either method of determining the election seven were chosen, and the only dispute is as to the remaining two members. If the nine receiving the highest number of votes were elected, then Reardon and Arosin were elected, and Holman and Banholzer have no title to the offices, and the demurrer of the state should be sustained. Four of those conceded to be elected were democrats and acting with the respondents claim to be a majority of the assembly and to be legally acting as the assembly. The remaining three were republicans, and, acting with Reardon and Arosin, claim to be a majority of the assembly and to be legally acting as the assembly. As a consequence there are two bodies each claiming to be the legally constituted assembly. The financial officers of the city are unwilling to assume the responsibility of determining which body is the legally constituted assembly, and as a result the administration of city affairs is delayed. The speedy determination of the question raised is therefore of great public importance.

The nine highest are the duly elected assemblymen under the terms of the charter. Its language is, "The members of the assembly shall be elected at large from (and not by) the body of the electors of said city." Standing by themselves these words are capable of but one meaning, viz: Any nine electors of the whole body of

electors of the city are eligible to the offices of assemblymen. "Elected at large" certainly means elected on a vote of all the electors of the city. "From the body of the electors of said city" means any of the electors regardless of particular place of residence in the city. The legislature has used the strongest terms to express the idea that any electors of the whole body shall be eligible, and has used the same words three times in the law. There is nothing in the law to support respondents' contention except the clause beginning, "and four of same shall reside east of Wabasha Street, &c." But these words do not say that to be eligible for election a candidate at time of election must reside in a particular locality, or that four assemblymen must be selected from among the residents of a certain section of the city. It is not an uncommon thing to provide by law that an officer when elected shall thereafter while administering his office reside or have his office at a particular place. 1878 G. S. ch. 6, §§ 7, 13, 32, 45; ch. 8, §§ 129, 148, 174, 220, 230, 258.

It seems to us that the words, "and four of same shall reside," are at the most merely directory in requiring that while in office the assemblymen shall reside in certain districts.

The charter provision as to residence is unconstitutional and void. All electors of the city may vote for all nine, but no elector can fill any of the offices except those belonging to his district. An elector in the sixth ward votes for nine officers, and is only eligible for one, and the election of the assemblymen from the sixth ward is determined, not by the voters of the sixth ward, but the whole body of voters of the city. This we submit is contrary to the plain provision of the Constitution, Art. 7, § 7. Cooley Const. Lim. (4th Ed.) 78, and cases cited; *State* v. *Clough*, 23 Minn. 17; *Taylor* v. *Sullivan*, 45 Minn. 309; *Barker* v. *People*, 3 Cow. 686; *Page* v. *Hardin*, 8 B. Mon. 648.

The authorities to the effect that the legislature has no power to add to or to take from the constitutional provisions are numerous. In addition to those cited *supra*, see *State ex rel.* v. *Tuttle*, 53 Wis. 45; *State ex rel.* v. *Baker*, 38 Wis. 71; *State ex rel.* v. *Williams*, 5 Wis. 308; *People* v. *Schiellein*, 95 N. Y. 124; *Kinneen* v. *Wells*, 144 Mass. 497; *Black* v. *Trower*, 79 Va. 123; *Quinn* v. *State*, 35 Ind. 485; *Morris* v. *Powell*, 125 Ind. 281; *St. Joseph & D. C. R. Co.* v. *Buchanan Co. Court*, 39 Mo. 485; *Rison* v. *Farr*, 24 Ark. 161; *People* v. *Canaday*, 73 N. C. 198.

It may be claimed that the constitutional provision does not relate to the municipal offices in question. Such position is clearly untenable. That the position of assemblyman is a public office will probably not be disputed. Mechem, Pub. Off. § 43; *Sanborn* v. *Neal*, 4 Minn. 126; *People ex rel.* v. *Hurlbut,* 24 Mich. 44.

That it is an office covered by the Constitution, Art. 7, § 7, seems equally clear. It relates to any election to any office which now is or hereafter shall be elective by the people except as otherwise provided in this Constitution or the Constitution and laws of the United States. Any claim that there is an implication to confine this article to any particular class of offices is by the explicit language of our Constitution excluded. The question has been determined in this court by the decisions in *Brisbin* v. *Cleary*, 26 Minn. 107; *Harrington* v. *Town of Plainview*, 27 Minn. 224; *State* v. *Fitzgerald*, 37 Minn. 26; *State* v. *Clough*, 23 Minn. 17.

This is in accord with decisions in other jurisdictions. *State ex rel.* v. *Williams*, 5 Wis. 308; *State ex rel.* v. *Tuttle*, 53 Wis. 45; *People* v. *Canaday*, 73 N. C. 198; *St. Joseph & D. C. R. Co.* v. *Buchanan Co. Court*, 39 Mo. 485.

It is well settled that even if a candidate who receives the highest number of votes be ineligible, yet a minority candidate is not entitled to the office. *Barnum* v. *Gilman*, 27 Minn. 466. It therefore follows that even if Reardon and Arosin be declared ineligible, Holman and Banholzer were minority candidates and not elected.

It is quite clear that if the provision relating to residence is unconstitutional, yet the remainder of the law is constitutional. *People ex rel.* v. *Kenney*, 96 N. Y. 294; *State ex rel.* v. *Tuttle,* 53 Wis. 45; *Reimer* v. *Newel*, 47 Minn. 237.

*Frank W. M. Cutcheon, John H. Ives*, and *J. C. Michael*, for respondents.

To hold these provisions of the law as to residence to be merely directory will defeat their purpose, for if they be directory it will often occur that there will be elected to the assembly from some one division of the city more persons than by these provisions of the charter are permitted to reside in that division. And in such case, if the directions of the law were to be obeyed, it would be necessary that of the persons so elected a sufficient number should change

their residences to reduce the number of assemblymen residing in that district to the number prescribed by law, and to increase the number residing in the remaining districts to the number so prescribed. It would be necessary to decide which persons should remove, also in which districts the persons to remove should thenceforth reside. It would be necessary to enforce these decisions when once reached. To accomplish any of these things would be clearly impossible. These provisions have none of the characteristics of directory statutes. They were enacted for the benefit of the public in the public interest, and a statute so enacted will never be considered directory. *Bowen* v. *City of Minneapolis*, 47 Minn. 115.

The respondents claim that Const., Art. 7, § 7, does not apply to municipal offices, and for that reason, that portion of Sp. Laws 1891, ch. 6, § 1, which requires assemblymen to reside in certain defined portions of the city does not offend against it. They are a class of offices denominated "statutory." The legislature, in the absence of express constitutional restriction, possesses absolute freedom to create or abolish such offices at pleasure, and to attach to them such restrictions as it chooses. It may prescribe the qualifications of the incumbents, and may make the offices elective or appointive in such manner as it sees fit. Cooley, Const. Lim. (3rd Ed.) p. 168, and cases there cited; *People ex rel.* v. *Clute*, 50 N. Y. 451; *Jeffries* v. *Rowe*, 63 Ind. 592; *Buckner* v. *Gordon*, 81 Ky. 665; *Jordan* v. *Bailey*, 37 Minn. 174; *Robinson* v. *White*, 26 Ark. 139; *Waldraven* v. *Memphis*, 4 Coldw. 431.

The Constitution nowhere, from beginning to end, makes any mention or suggestion of the creation or regulation of any municipal office, except that of city judge. That subject is left wholly and completely to legislative discretion. The absence of any reference to city officers is significant and shows that the framers did not have city offices in mind at all. Subsequent amendments of the original instrument do not aid in the construction of Art. 7, § 7. These facts are almost conclusive evidence that the framers of the Constitution did not intend to interfere with the full power and free action then possessed by the legislature in providing for such municipal officers as they deemed necessary, and in prescribing their qualifications as well as the method and manner of their election or appointment.

There is nothing in Const., Art. 7, § 7, that conflicts with this con-clusion. It prescribes the eligibility of officers. Of what officers? Officers "now or hereafter elective by the people." What is meant by "elective by the people"? Does it not mean those who are by the terms of the instrument in which the words are used, made so elective? Such is the natural inference. To make the words mean more than this would be to extend their meaning entirely beyond their ordinary signification.

The words "or hereafter shall be elective" refer to state officers created by the Constitution. They were made primarily elective by the people, but under the county and township provision the framers of the Constitution knew that in a new state there must necessarily be hundreds and even thousands of county and township officers provided for by the legislature, as new counties and townships were organized thereafter. These are the officers "which now are or here-after shall be elected by the people" that the framers had in mind. *Jeffries* v. *Rowe*, 63 Ind. 592; *Buckner* v. *Gordon*, 81 Ky. 665; *State ex rel.* v. *Covington*, 29 Ohio St. 102; *McMahon* v. *Savannah*, 66 Ga. 217; *People ex rel.* v. *Clute*, 50 N. Y. 451.

MITCHELL, J. In their answer to the information filed to test re-spondents' title to the office of assemblymen of the city of St. Paul, two defenses are interposed. To the first defense the state de-murred, and the issue raised by this demurrer is the one now sub-mitted to the court. Its determination depends upon the construc-tion and constitutionality of the provision relating to the residence of assemblymen contained in the city charter (Sp. Laws 1891, ch. 6, § 1).

1. This provision, so far as here material, is as follows: "Said as-sembly shall be composed of nine (9) members. The members of the assembly shall be elected at large from the body of electors of said city, and four (4) of same shall reside east of Wabasha and Rice streets and north of the Mississippi river, and four (4) shall reside west of Wabasha and Rice streets and north of the Mississippi river, and one (1) shall reside in the Sixth (6th) ward of said city. * * * At the general municipal election of said city in eighteen hundred and ninety-two, (1892) * * * there shall be elected at large, from the electors of said city, and at each general municipal election held each

two (2) successive years thereafter, there shall be elected at large, from the electors of said city, nine (9) assemblymen, who shall reside in such portions of said city as hereinbefore provided."

The state contends that this has no reference to the eligibility of candidates for the office, but is merely directory as to where the assemblymen shall reside after they are elected. The language is not susceptible of any such construction. It clearly means that four of the assemblymen shall be elected from the electors residing in one part of the city, four from those residing in another part, and one from those residing in a third part. This construction is also the only one that is consistent with the manifest object of the provision (to secure local representation to the different parts of the city), or that would work in practice. Suppose the nine candidates receiving the highest number of votes all resided in one of these districts; which five of the nine would be required to change their residences? And to which of the remaining districts should each of the five remove? And, if they all refused to change their residences, what then? The provision relates to eligibility or qualification for election.

2. The provision of the constitution to which the state claims this provision of the charter is obnoxious is article 7, § 7, which reads as follows:

"Every person who by the provisions of this article shall be entitled to vote at any election shall be eligible to any office which now is, or hereafter shall be, elective by the people in the district wherein he shall have resided thirty days previous to such election, except as otherwise provided in this constitution, or the constitution and laws of the United States."

The contention of the respondents is that this applies only to constitutional, and not to municipal, offices. It must either apply to all elective offices, both constitutional and statutory, or else only to constitutional offices. There is no warrant for adopting a middle ground, and drawing the line at municipal (i. e. city or village) offices. The language of this constitutional provision will not admit of the limitation sought to be attached to it. By its express terms, it applies to "any office which now is, *or hereafter shall be,* elective by the people." The words italicized must of necessity refer to statutory offices, for the constitution presently determined

what constitutional offices should be elective.    Section 1 of the same article, fixing the qualification of voters, and section 6, providing that elections shall be by ballot, also indicate that wherever, in this article, elective offices and elections for elective offices are mentioned, reference is had to statutory as well as constitutional offices. This court has always ·construed section 7 as being applicable to statutory offices.    *State* v. *Clough*, 23 Minn. 17.    See, also, *Brisbin* v. *Cleary*, 26 Minn. 107, (1 N. W. 825;) *Harrington* v. *Town of Plainview*, 27 Minn. 224, (6 N. W. 777;) *State ex rel.* v. *Fitzgerald*, 37 Minn. 26, (32 N. W. 788.)    Hence, whenever any public office of any kind is made elective, section 7, art. 7, of the constitution becomes *ex proprio vigore* applicable and operative, and fixes the qualifications for eligibility.    This is a denial of power to the legislature to impose any greater restrictions or to add other qualifications for eligibility to those prescribed by the constitution.    Thus far we do not understand that there is any difference of opinion in this court.

3. The remaining question is whether this provision of the city charter imposes greater restrictions upon eligibility, or adds qualifications for eligibility additional to those prescribed by the constitution.    It seems to us that they do, and that is the way we think it would naturally strike the common sense of men.    The situation, plainly stated, is just this:    All the electors of the city may vote for all nine assemblymen, but no elector is eligible to any of these offices except the four or one, as the case may be, belonging to the district in which he resides.    We cannot see this in any other light than as an attempt to impose a restriction or limitation upon eligibility which is equivalent to imposing a qualification for election in addition to those fixed by the constitution.    It is urged with a good deal of plausibility that this provision of the charter does not render any elector ineligible to the office of assemblyman, for every one is eligible either to one of the offices included in one or the other of the two groups of four, or to the single office pertaining to the Sixth ward, and therefore no elector is deprived of any substantial constitutional right.    The very subtility and refinement of reasoning resorted to in support of this proposition tends to create doubt as to its soundness.    We cannot view this provision of the charter otherwise than as imposing a limitation upon or adding a condition to eligibility not permitted by the constitution.    To illustrate the case

more fully: Suppose a vacancy occurs in the office of assemblyman residing in the Sixth ward; who is qualified under the charter to be appointed to fill the vacancy? Certainly only those who would be eligible, to wit, the electors residing in that ward. Or suppose the charter had provided for filling vacancies by election; then, under this charter provision, we would have an officer to be elected by the electors of the whole city as one election district, but only the electors residing in the Sixth ward would be eligible. It would not be claimed that, as applied to such an election, the provision of the charter as to residence would be constitutional, for it would render ineligible all the electors in the city residing north of the Mississippi river. But if this provision be held invalid as applied to such an election, but valid as to the election now under consideration, we would have the anomaly of the same law being valid as to one election and invalid as to another for the same office in the same election district.

In short, the charter has attempted a scheme which, however commendable in spirit, is impossible under our constitution, to wit, to retain the city as one election district, and yet secure local representation for the different sections by limiting eligibility to the office of assemblyman by geographical lines. This is not the case of mere regulations designed to secure a pure and orderly election which may incidentally affect a person's opportunities to run for an office, but a case of a direct attempt to impose additional qualifications for eligibility.

To avoid misapprehension, we remark, in conclusion, that, in our opinion, the unconstitutionality of the provision as to residence does not affect the validity of the remainder of the city charter, which can stand in full force and effect with this objectionable clause eliminated.

Demurrer sustained.

BUCK, J., absent, sick, took no part.

CANTY, J. I dissent. I concede that the constitutional provision in question applies to city offices, and requires the candidate to reside in the particular division of the city before election, not to remove into it after election, if elected. I also concede that the provisions of the city charter are unconstitutional as applied to the election in question, if these provisions affect a substantial right

guarantied by the constitution. The whole city being one election district, I concede that, under the constitutional provision in question, every voter is eligible and entitled to be elected to any one of these nine offices for which he may receive the requisite number of votes, and that this provision of the charter is unconstitutional if, by being confined to a particular one or a particular four of these nine offices, and not being allowed to be a candidate for any of the others, he is deprived of a substantial right. If I have a constitutional right to my choice of one of nine silver dollars, all exactly alike, and, instead of permitting me to choose, the statute designates which one I shall take, I have lost no substantial right, and the statute is not unconstitutional. This is exactly the constitutional question involved in this case, and the only one.

Each of these nine offices is exactly like the others. Each of the nine members, when elected, performs the same functions, has the same powers, honors, and emoluments, and bears the same responsibilities. Then, if the voters have the right to elect the candidate to one of these offices, and he has lost no opportunity of being elected by being confined to a particular one, he is not deprived of any substantial right. The law refuses to recognize a distinction without a difference, to correct error without prejudice, or to enforce rights that are not substantial. The legislature had a right to say that, instead of there being what may be called a "sweepstake race" for these nine offices, there should be nine separate races, one for each office, all run at the same time; and, if each candidate had a right to take his choice of which one of these nine races he would enter, he could not complain.

The legislature had a right to label each of these nine offices with a different label, and require the voter to vote for a specified candidate for a specified office, and provide that the votes cast for such candidate for several of these nine offices cannot be all counted for him for one office. But, unless something is done before election to designate for which one of the nine offices a particular candidate shall run, it will result in confusion. Jones may get 1,000 votes for office No. 1, 1,800 for office No. 2, 1,500 for office No. 3, and thus the vote for him may be distributed or scattered through the whole nine offices. Has the legislature no right to prevent such confusion by designating which one of the nine offices Jones shall run for, if they thereby deprive him of no right but an imaginary one? That is

what the legislature has done in this case. But, instead of labeling each of the nine offices by a different label, they have labeled four by one label, four by another, and one by another, and accordingly provided for three separate races, one for each group of offices. The candidate who entered one race ran for one of the four offices in a particular group against the other candidates running for the offices in that group, and, if he was not more than fourth in the race, he was entitled to an office; and so of the candidate who ran for one of the offices in the other group of four, and the candidate who ran for the office standing alone in a group by himself ran only against the candidates running for that office, and had no right to it unless he was first in the race. And certainly, if each candidate had a right to select which race he would enter,—out of which group he would seek an office,—his constitutional rights were not infringed. But what has he lost by having the law designate the group in which he should run? It is not claimed that there was any gerrymandering or unfair apportionment of the eligible voters among the groups, or that each candidate did not have just as much opportunity to be voted for and be elected when the statute made the choice for him as if he had made it himself. To say that under such circumstances his constitutional right has been infringed is to say that it is so sacred a right that it cannot be regulated at all. If this is true, then the whole Australian ballot law is void, because it provides (Laws 1893, ch. 4, § 44) that the certificate of nomination of the candidate for a state office shall be filed more than four weeks before election, for a county office three weeks, and for a city office ten days, before election, and clearly makes all persons not having their certificates then filed and the fees paid ineligible for that or any other office at that election. See, also, Laws 1891, ch. 4, § 38.

To this it is answered that, suppose a special election is held to fill a vacancy, this statute makes all persons not residing in a particular division of the city ineligible, and therefore the law is unconstitutional. I concede it. That is a very different case. In that case the voters residing in the other two divisions of the city would at that election be deprived of a substantial right. But because it might be unconstitutional at an election which may never be held, or one which by mere accident may be held, it does not follow that it must be unconstitutional as to all other elections. Because the provisions of a statute may be unconstitutional when attempted to be

applied to one condition of things is no reason why it is unconstitutional as applied to all other conditions of things. Conditions may be discovered as applied to which many otherwise constitutional laws are unconstitutional. Whether or not the scheme of the legislature can be carried out to its full extent is not the question here. We are not trying the constitutionality of a scheme, but of an action.

But, before it can be held that Reardon and Arosin are entitled to these two offices, it must not only be held that it is unconstitutional to prevent each of them from running for any of these nine offices which he or the voters might select, but it must also be held that it is unconstitutional to divide these offices into groups at all, so as to prevent him from running a single race for all of these nine offices, with the constitutional right to one, if he did not fall further behind than ninth in the race; and it seems to me that the majority have found it necessary to answer this proposition by ignoring it.

As well may it be said that any eligible voter has a constitutional right to run for all the county offices filled at the same election by all the voters of the county. But, the legislature having failed to provide for any such race, he runs for register of deeds, and, being defeated for that office, discovers after election that he has more votes for the office of register than any man has for county auditor; therefore he claims the office of county auditor, though he never ran for it at all.

His claim would be just as reasonable as the claim of Reardon or Arosin in this case. Neither of them ran for the offices here in question at all, but for one of four other offices, which he failed to get; and, being defeated, each discovers that he received more votes than the respondents running another separate race at the same election, for other and different offices in a separate group of four.

It seems to me that he has no more right to an office for which he did not run, simply because he was not allowed to run for it, than any other eligible voter in the city.

If this reasoning is too subtile and refined for the majority of the court, I cannot help it.

(Opinion published 59 N. W. 1006.)