Robert PAVLAK, Relator,

v.

Joan GROWE, Secretary of State of the State of Minnesota, Respondent.

No. 50142.

Supreme Court of Minnesota.

July 13, 1979.

O'Neil, Burke & O'Neil, St. Paul, and Michael J. Bolen, Edina, for petitioner.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., and LeRoy C. Paddock, Sp. Asst. Atty. Gen., St. Paul, for respondent.

SHERAN, Chief Justice.

This is an original action brought here pursuant to Minn.St. 203A.18, subd. 1, which empowers this court to order the Secretary of State to correct any error made in placing or failing to place any name upon an election ballot. On May 22, 1979, Robert Pavlak moved this court for an order directing Joan Growe, Secretary of State of the State of Minnesota, to accept and file his affidavit of candidacy for the Minnesota House of Representatives. By unanimous order dated May 25, 1979, the court did so direct, noting that this opinion setting out the reasoning underlying the court's action would follow.

The factual background of this stage of the litigation resulting from Mr. Pavlak's 1978 campaign and election to the Minnesota House of Representatives is relatively simple. On November 7, 1978, Mr. Pavlak was elected to the House of Representatives by a margin of 321 votes. An election contest was brought on the grounds that Mr. Pavlak had caused to be distributed campaign literature containing false information in violation of Section 210A.04 of the Fair Campaign Practices Act.[1] Mr. Pavlak took his seat pending resolution of the contest. Following a trial and subsequent review by this court, the House, acting pursuant to the power conferred by Article IV, Section 6 of the Minnesota Constitution to judge the election returns and eligibility of its members, voted that Mr. Pavlak should be excluded from his seat.

The House vote, taken May 18, 1979, adopted a minority committee report which stated the reasons for and effect of the exclusion as follows:

"1. Contestee, Robert Pavlak, committed a deliberate, serious and material violation of the provisions of the Minnesota Election Law not excused by the provisions of Minnesota Statutes Section 210A.38.

"2. Robert Pavlak was not legally elected and is not entitled to retain the seat as Representative from Legislative District 67A, Counties of Dakota and Ramsey in the State House of Representatives.

"3. That there is a vacancy in the office of Representatives from Legislative District 67A, Counties of Dakota and Ramsey and that this vacancy be certified to the Honorable Albert H. Quie, Governor of the State of Minnesota in order that he may issue a writ of election as provided for by law so that the vacancy may be filled." Journal of the House, 1979, p. 2578.

The same day the Speaker of the House transmitted the following certification to the Governor:

1. For a more detailed discussion of the election contest arising from that campaign, see *Schei-* *bel v. Pavlak*, 282 N.W.2d 843 (Minn.1979) filed May 11, 1979.

"It is my duty to inform you, in order that you may issue a writ of election as required by law, that today, Friday May 18, 1979, the House of Representatives has declared a vacancy in the office of Representative in Legislative District 67A.

"The Chief Clerk of the House of Representatives will forward to you a copy of the Journal of the House as evidence of this action by the House." Journal of the House, 1979, pp. 2667–8.

Acting pursuant to Minn.St. 202A.61 et seq., Governor Quie called a special election for June 19, 1979, to fill the vacant seat.

Mr. Pavlak attempted to file for the special election with the Secretary of State, and received the following response from the office director:

"Pursuant to M.S. 210A.39 we are unable to accept your affidavit of candidacy for the vacancy in Minnesota Legislative District 67A."

The statute relied upon, Minn.St. 210A.39, provides as follows:

"A candidate elected to an office, and whose election thereto has been annulled and set aside for any offense mentioned in sections 210A.01 to 210A.44, shall not, during the period fixed by law as the term of such office, be appointed or elected to fill any vacancy which may occur in such office. A candidate or other person who is convicted of any offense mentioned in sections 210A.01 to 210A.44, shall not, during the period fixed by law as the term of the office with respect to which the election was held and said offense was committed, be appointed or elected to fill any vacancy in such office. Any appointment or election to an office made in violation of or contrary to the provisions of this section shall be void."

After this rejection, Mr. Pavlak brought the current action, contending, among other things, that Minn.St. 210A.39 is unconstitutional and requesting an order from this court before the deadline for filing passed on May 29, 1979. Argument was heard on May 25 from counsel for Mr. Pavlak and assistants of the Attorney General of the State of Minnesota, representing the Secretary of State. The order of this court directing the Secretary of State to accept Mr. Pavlak's application was issued the same day.

To begin with, there is no doubt that by its plain language Minn.St. 210A.39 precludes Mr. Pavlak from running in the special election. Consequently, if the statute is constitutionally valid, the Secretary of State acted properly in rejecting Mr. Pavlak's affidavit of candidacy. Consideration of the constitutionality of 210A.39 must begin, as with all questions concerning eligibility for public office, with Article VII, Section 6 of the Minnesota Constitution:

"Every person who by the provisions of this article is entitled to vote at any election and is 21 years of age is eligible for any office elective by the people in the district wherein he has resided 30 days previous to the election, except as otherwise provided in this constitution, or the constitution and law of the United States."

This constitutional provision forcefully presents an important democratic principle—that all citizens meeting minimal, unchanging requirements are eligible for the elective positions that control their government. The opinions of this court applying Article VII, Section 6, have consistently held that, as a guarantee of universal eligibility for public office, its standards may not be made more restrictive by legislative action unless expressly authorized by another constitutional provision. In keeping with this interpretation, this court has struck down statutes requiring candidates for the office of at-large council member of the City of St. Paul to reside in particular sections of the city, *State ex rel. Childs v. Holman*, 58 Minn. 219, 59 N.W. 1006 (1894); making county commissioners, surveyors, and treasurers ineligible for the office of county auditor, *Hoffman v. Downs*, 145 Minn. 465, 177 N.W. 669 (1920); requiring court commissioners to be learned in the law, *State ex rel. Froehlich v. Ries*, 168 Minn. 11, 209 N.W. 327 (1926); and requiring municipal judge of the village of Per-

ham to be a person learned in the law and duly admitted to practice as an attorney in this state,[2] *State ex rel. Boedigheimer v. Welter*, 208 Minn. 338, 293 N.W. 914 (1940). See, also, the cases collected at 34 A.L.R.2d 169, § 5.

The office involved in this case is that of representative to the Minnesota House of Representatives. Since Article VII, Section 6, specifies that its eligibility standards shall apply "except as otherwise provided in this constitution," the additional constitutional qualifications for the office of representative set forth in Article IV, Section 6, are applicable:

"Senators and representatives shall be qualified voters of the state, and shall have resided one year in the state and six months immediately preceding the election in the district from which elected."

It is undisputed that Mr. Pavlak meets these eligibility standards, being a qualified voter, a resident of Minnesota for one year, and a resident of District 67A for six months. Furthermore, he meets the age requirement of Article VII, Section 6, that remains unchanged by Article IV, Section 6.

It is evident, then, that Mr. Pavlak possesses all the constitutional qualifications necessary for candidacy in the special election. If he is nonetheless precluded from running by statute, it can only be because Minn.St. 210A.39 creates an additional qualification for the office, i. e., that the person otherwise qualified shall not have violated the Fair Campaign Practices Act in a prior campaign for the same term of office. It is our conclusion that this additional qualification directly contradicts the guarantee of universal eligibility found at Article VII, Section 6, and cannot stand. We reach this conclusion in the face of three substantial arguments to the contrary, about which an explanation of our reasoning is in order.

1. In their brief which, although submitted on short notice, has been very helpful to our analysis of these issues, the Attorney General's representatives reasonably

contend that Minn.St. 210A.39 does not establish an additional qualification at all. Rather, it is justified as a necessary extension of the legislature's acknowledged power to regulate the conduct of election campaigns, expressed in the Fair Campaign Practices Act itself. The leading case in this area is *Saari v. Gleason*, 126 Minn. 378, 148 N.W. 293 (1914), in which this court first approved the legislative regulation of election campaigns through the then-entitled Corrupt Practices Act. John J. Gleason had been elected mayor of Eveleth. When J. S. Saari, his opponent, challenged that election on the grounds of campaign activity in violation of the Act, Gleason claimed the constitutional guarantee of eligibility for public office (then found at Article VII, Section 7) precluded the addition of this new statutory qualification; that is, the office-holder must not have violated statutory campaign standards. However, the court refused to characterize the annulment of an election on the grounds of legislatively proscribed campaign activity *in that election* as an additional qualification for office:

"We think that a statute prohibiting corrupt practices in elections and preventing any candidate employing corrupt means to obtain an office does not, in any proper sense, impose a new test of eligibility to office at all. It simply excludes a candidate, employing unlawful means, from enjoyment of a particular office under an election which his own unlawful acts have rendered of no effect. *It prevents his reaping the benefit of his own wrong. It says, not that he is ineligible to this office, but that he must use honest means to obtain it.*" (Emphasis added) 126 Minn. 382, 148 N.W. 295.

■ We do not disagree that *Saari* extends significantly the permissible scope of legislative activity in this area. No one would dispute the authority of the legislature to proscribe unfair campaign practices in the interest of promoting fair elections. But, as Mr. Gleason's challenge implied, it is

2. This decision was prior to enactment of the current constitutional provision authorizing the legislature to prescribe qualifications for judges

other than of the supreme court and district courts. Article VI, Section 5.

another matter to set aside an election in which such practices have taken place. Yet, the court in *Saari* logically and emphatically ruled that the power to promote fair elections necessarily implies the power to set aside unfair elections. Of what use would it be to assess a misdemeanor penalty against the offender of an election law while allowing him to hold the office obtained in part by his very violation? An offender may not reap the benefit of his wrong, and unfair elections must therefore be set aside. This is not the addition of an eligibility requirement that is new; rather, it is a recognition of the oldest requirement for democratic office of all—the candidate must have prevailed in a valid election. If he has not done so, he may not sit.

But the language of *Saari*, quoted above, which establishes this principle also indicates the limit of this legislative power. The legislature may promote fair elections, which necessitates setting aside unfair elections. It does not necessitate raising the eligibility requirements for subsequent elections which themselves can always be set aside if unfair. An election law violator can only reap the benefit of his wrong if he prevails in the election campaign in which his violation took place. If his false statement or other impropriety is exposed, the election annulled, and a special election called, the slate is clean. The previous violator can hardly then reap benefits resulting from his prior falsehood from an electorate which at this point could hardly be unaware of the reason for the special election. There is no more necessity to exclude the prior election law violator from the new election than to exclude a host of other citizens for reasons that, while seeming wise to a particular legislature, are not specified in the constitutional provision which guarantees universal eligibility for public office of citizens with minimal qualifications. *Saari* ruled that a candidate "must use honest means to obtain [an office]." We, of course, agree—and believe that a prior election law violator who enters

public office following a fairly conducted special election has obtained that office honestly. In a democracy, and particularly in a jurisdiction with a constitutional provision akin to Article VII, Section 6, it is for the people, not a particular legislature, to decide if an election law violator should be returned to the office.

2. The reasoning of the State that Minn.St. 210A.39 is a necessary extension of the power to prohibit unfair campaign activity and annul those elections in which it occurs is bolstered by the fact that the statute precludes an offender only from election to the same term of the same office. It is true that the few similar cases of other jurisdictions have disapproved laws that prohibited election to *all* offices during the remainder of the term following the violation, or for a period of time beyond the remainder of the term, or both. *State v. Carrigan*, 82 N.J.L. 225, 82 A. 524 (1912); *State ex rel. Palagi v. Regan*, 113 Mont. 343, 126 P.2d 818 (1942); *Labor's Educational and Political Club—Independent v. Danforth*, 561 S.W.2d 339 (Mo.1978). The Minnesota statute is narrower, and this case consequently more difficult. But we are unable to distinguish the principle underlying these decisions from that which must be applied here. *Saari* extended legislative authority from the regulation of campaign activity to the setting aside of unfair elections. The three cases above refused to further extend it to prohibiting a violator from running in a future election. The instant case presents a problem more like the latter than the former. If Mr. Pavlak engaged in the distribution of a false statement and was in part elected thereby, the remedy is to annul that election. There is no need[3] nor authority for excluding him from any future election. The power to regulate campaign conduct reaches a constitutional limit when it moves from annulment of a past election to exclusion from a future one; we see no difference whether that future election is held the next day or in ten years or whether it is for the same

3. The State suggests the necessity for excluding the violator from the special election is that otherwise a candidate is in a "no-lose" situation—he can violate the law knowing, if discovered and his victory set aside, he will always have another chance to run again. If the candidate's conduct is a violation of 210A, he can be prosecuted criminally.

office or any other. An unfair election may be set aside; no one may be excluded from an election, *any* election, except on constitutionally specified grounds.

3. The third area of concern to which we must respond has been the greatest source of confusion in this case. The issue arises in a number of different forms, and its troubling nature makes it incumbent upon us to offer our opinion on the broader principles in this area.

Simply put, the question is whether this case is any different because a legislative election is involved. Article IV, Section 6, to which we have referred earlier in noting that Mr. Pavlak meets the residency requirements for state legislator there prescribed, goes beyond establishing standing qualifications for the office. It also authorizes each legislative body to "be the judge of the election returns and eligibility of its own members." In our opinion in the election contest involving Mr. Pavlak, *Scheibel v. Pavlak*, 282 N.W.2d 843 (Minn.1979) filed May 11, 1979, we emphasized the importance and exclusiveness of this legislative prerogative. Article VII, Section 6, with which we have found Minn.St. 210A.39 to be in conflict, specifically conditions its guarantee of eligibility: "except as otherwise provided in this constitution." Could it be that Minn.St. 210A.39 is constitutionally valid as an expression of the legislature's authority to judge the eligibility of its own members? As the State puts it:

"The Minnesota House has determined relator's eligibility pursuant to article IV, section 6 and has found him to be ineligible for the 71st session. The constitution requires nothing more than that the House be allowed to make this determination."

There is merit to this theory. The House did exercise a valid power on May 18 when it excluded Mr. Pavlak. Having done so, and with a statute on the books indicating such an exclusion would preclude his reelection, the House could reasonably be viewed as having declared him ineligible for the entire two-year session. There are also weaknesses in this reasoning. Minn.St. 210A.39 was passed by a prior legislature; the power of this House to judge the eligibility of its members may hardly be so fettered. Furthermore, though the statute was on the books, there was no indication in the report adopted by the House that Mr. Pavlak was to be excluded from the subsequent special election. To the contrary, there is evidence that at least some of the members voting to exclude Mr. Pavlak did so under the assumption that the voters would have an opportunity to pass judgment upon him again. Finally Minn.St. 210A.39 is not limited in its application to ousted legislators. It is a strained interpretation to characterize it as possibly unconstitutional as applied to non-legislative candidates but as a procedural rule for the exercise of the legislature's power to judge the eligibility of its members.

However, regardless of the outcome of this debate on the *manner* in which the House's power to judge the eligibility of its members may be exercised, we are of the opinion that the *scope* of such power does not extend to precluding Mr. Pavlak from running in this election. The following line of reasoning makes this limited scope clear. If the undisputed legislative power to judge the eligibility of members and exclude those ineligible permits the Secretary of State to refuse to allow Mr. Pavlak to file for this June election, then that power certainly would permit the House of Representatives to refuse to seat him at the beginning of its session next January, should he have prevailed in the special election. This is unquestionably so as the latter is more directly an expression of the legislative power of Article IV, Section 6. Conversely, then, if Mr. Pavlak could not constitutionally be excluded by the House in January, he could not be excluded by the Secretary of State in June.

Could the House have excluded Mr. Pavlak next January for unfair campaign activities in his original campaign in November, 1978? We think not. The principal authority here is the seminal case of *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491, 1969, in which the United States Supreme Court extensively analyzed the historical scope of the provision found in the federal and all state constitutions empowering the legislature to be the judge

of the eligibility of its members. The court concluded that such a provision extended only to ascertaining whether a prospective member met the constitutionally prescribed, or standing qualifications; it did not authorize the establishment of additional requirements for membership. Thus, Congressman Powell could have been excluded for failing to meet the requirements of age, residency and citizenship, but he could not be excluded for improper financial manipulations.

We have no indication that the corresponding provision of the Minnesota Constitution was intended to have a meaning any different from the federal provision. Accordingly, the House under Article IV, Section 6, may at any time exclude Mr. Pavlak only if he fails to meet the constitutionally prescribed eligibility standards. Which of these does he fail to meet? Only one. The House in May, 1979, excluded Mr. Pavlak because of a violation of the Fair Campaign Practices Act. In other words, it determined he had not been validly elected in a fair election—certainly a prerequisite for membership.[4] If Mr. Pavlak had prevailed in a special election that was conducted fairly, this single impediment to membership would no longer have existed. To say he may not have been seated in January because of an election law violation in a *prior* election or because of a *prior* exclusion from the House would be to establish another qualification for legislative membership in contravention of *Powell.* Consequently, there would in January exist no constitutional grounds for his exclusion. If, in its most direct application by the House, the power of Article IV, Section 6 would not extend to the exclusion of Mr. Pavlak in January, then it necessarily follows that in its much more indirect and

tenuous application by the Secretary of State through Minn.St. 210A.39, this power is insufficient to support Mr. Pavlak's exclusion from the special election in June.

Since neither Article IV, Section 6, the narrow limitation of the Minnesota statute, nor the legislative power to regulate the conduct of election campaigns acknowledged in *Saari* makes Minn.St. 210A.39 anything other than an additional qualification for office not specified by the Constitution, the statute cannot stand.

Motion granted by order of this court of May 25, 1979.

---

4. The question arises at this point whether the restrictive interpretation of the legislative authority to judge the eligibility of its members found in *Powell* and adopted here precludes the legislature from even going so far as to review the validity of an election. Such review, after all, has nothing to do with age, residence, citizenship, or voting status. But not only is a valid election an obvious, if unstated, eligibility requirement for membership in a legislative body, the constitutional provision also makes the legislative body "judge of the election returns" of its members. To judge election returns surely extends to ascertaining if they reflect a fair vote. Thus, not only does the legislature have the power, approved in *Saari*, to regulate the conduct of election campaigns by statute, presumably enforced and applied by the executive and judicial branches, but under Article IV, Section 6, it also has the power to *itself* review the fairness of the election campaigns of legislative candidates. However, as the discussion in the text points out, this power to review campaigns extends only to the immediately preceding election.