**STATE of Alaska, Alaska Public Offices Commission, Petitioner,**

v.

**Joseph D. MARSHALL, City Councilman for the City of Fairbanks and Assemblyman for the Fairbanks North Star Borough, Respondent.**

**No. 5614.**

Supreme Court of Alaska.

Sept. 8, 1981.

Elizabeth Page Kennedy, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for petitioner.

Arthur L. Robson, Fairbanks, for respondent.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

### I. Introduction

This case involves a petition brought by the Alaska Public Offices Commission (APOC), before the court on original jurisdiction, which seeks to declare void[1] the election of Joseph Marshall to the Fairbanks City Council and Fairbanks North Star Borough Assembly. On December 30, 1980, the case was submitted to superior court judge Eben Lewis as a special master of this court. The Master's Report, released April 10, 1981, found a violation of disclosure laws but recommended solely prospective enforcement of the forfeiture of office provision, pending APOC promulgation of regulations clarifying application of this sanction.

### A. Facts

Stipulated facts and the Master's findings establish that Marshall violated state election laws by failing to timely file a seven-day pre-election contributions and expenditures report during the October, 1980, Fairbanks municipal and borough elections. The report was due September 30, 1980. The election was held October 7, 1980. Marshall's seven-day report was filed, i. e., received, by the APOC on October 16, 1980 (sixteen days late), although it was prepared October 14, 1980.

Marshall admits receiving on September 28th an APOC letter, dated September 24,

---

1. AS 15.13.120(b) states:

   "The nomination for, or election to, an office of a candidate who violates a provision of this chapter, ... is void, and, if he is elected, the successful candidate may not hold office and the office shall be filled as required by law in the case of a vacancy."

1980, which informed him, in part, that his seven-day report was due September 30, 1980. After the deadline passed, the APOC, by letter dated October 6, 1980 (one day before the election), informed Marshall that his report was past due. The letter discusses civil fines for Marshall's filing delinquency, but makes no mention of a forfeiture of office sanction. The letter was not signed for (i. e., not received) until October 14th, the day Marshall finally prepared the report.

Marshall has a history of failing to timely file his contribution and expenditures reports for municipal and borough elections. During the 1974 elections, his seven-day pre-election report was filed twenty-two days late; no disciplinary action was taken. During the 1977 elections, his seven-day pre-election report was filed sixteen days late; again, no disciplinary action was taken.

Although Marshall, in the words of the Master, "had prior experience with the law requiring filing reports of campaign finances," the Master nonetheless concluded that Marshall's failure to timely file his 1980 pre-election report "should be characterized as careless or neglectful." This conclusion was based on a finding that "[n]o corrupt or fraudulent acts" were committed, and apparently on Marshall's testimony that he "just forgot" to file.

### B. Statutory Framework

Candidates for elective office must disclose certain information in order to qualify for office. Among other things, the candidate must file up to five reports disclosing campaign contributions and expenditures: (a) one is due 30 days before the election; (b) one is due 7 days before the election; (c) one is due 10 days after the election; (d) one is due on December 31st of each year during which contributions or expenditures were made which were otherwise unreported; and (e) one is due within 24 hours of any contribution over $250 made during the week preceding the election. AS 15.13.110. Candidates for municipal office must comply with these reporting requirements unless the local government votes to take itself outside the scope of coverage. AS 15.-13.010. Neither the city nor borough has exempted itself.

Three sanctions are available when a candidate violates the reporting requirements: imprisonment, civil fine, or forfeiture of office. Failure to make a statement or report, e. g., the seven-day pre-election report, is an explicit violation. AS 15.13.-120(a)(1). Violations can be treated as misdemeanors, punishable by up to one year imprisonment or a maximum $5,000 fine. AS 15.13.120(a). Daily civil penalties may also result from late filing; the maximum amount for late seven-day reports is $50 per day. AS 15.13.125. Finally, an election or nomination "is void" if obtained concurrent with a violation of the chapter. AS 15.13.-120(b).[2]

The APOC has, by regulation, provided for a schedule of civil penalties and for a process of assessment,[3] notice,[4] challenge,[5]

---

**2.** *See* note 1, *supra.* The provision continues: "When a violation of this chapter is alleged, the candidate's right to the nomination or the office may be tested in an action brought in the supreme court as a matter of original jurisdiction. All cases of this nature shall be in a preferred position for purposes of argument and decision, so as to assure a speedy disposition of the matter."
AS 15.13.120(b).

**3.** The highest civil penalty is reserved for delinquent seven-day pre-election reports: (a) if the report is less than thirty days late, the candidate may be assessed $5 a day, up to a maximum of $50; (b) if more than thirty days delinquent, "then the commission will, in its discretion and on a case-by-case basis, assess a civil penalty not to exceed" $50 a day. 6 AAC 29.390(d)(1)(A) and (B).

**4.** 6 AAC 29.390 states, in part:
"(c) Commission staff will send notice to each candidate or group of his or its delinquency within five days after the due date of the report.

. . . .

(d) Upon receipt of a delinquent campaign disclosure report, commission staff will

. . . .

(2) within five days after receipt of a delinquent report, send a notice of the civil penalty assessed against the candidate or group, and include
(A) a statement of the amount of the assessment; and
(B) an affidavit appeal form."

**5.** 6 AAC 29.390 continues:
"(e) A candidate or group subject to a civil penalty assessment may

resolution,[6] and appeal[7] regarding these penalties. No regulations have been promulgated which directly deal with the forfeiture[8] of election sanction.

## II. Legal Issues

After first finding original jurisdiction to be a legitimate exercise of this court's power, the Master concluded, *inter alia* : (a) that the forfeiture sanction is a constitutional exercise of legislative power because it "does not determine eligibility for public office but rather establishes a mechanism to determine whether an eligible candidate may be permitted to enjoy that office ... "; (b) that the statute does not require proof that the violation was willful, and, further, that there is "no indication of a legislative intent respecting the degree of willfulness" required; (c) that the statute fails to provide standards for testing the candidate's right to office; and (d) that AS 15.13.-120(b), the forfeiture sanction, should be construed as directory rather than mandatory as applied to delinquent reporting violations, pending the promulgation of regulations detailing the sanction's applicability, and in any case should not apply to any 1980 elections.[9] We conclude that the statute is valid and that its plain language requires us to declare void Marshall's election to the city council and borough assembly.

(1) submit, within 30 days after receipt of the assessment notice described in (d)(2) of this section, an affidavit stating reasons for the late filing to show why a civil penalty should not be assessed; an affidavit

(A) is a statement in writing made under oath and upon penalty of perjury; and

(B) must be sworn to before a notary public, municipal clerk, court clerk, postmaster, or any other person authorized to administer oaths or, if none of the preceding alternatives is available, may be signed by the official without benefit of the oath so long as the official states, in writing, that the affidavit is signed under penalty of perjury; or

(2) pay, within 30 days after receipt of the assessment notice described in (d)(2) of this section, the penalty assessed.

(f) If a candidate or group subject to a civil penalty assessment for the late filing of a campaign disclosure report refuses, or fails, within the time required, to submit an affidavit or make payment, the commission staff will refer the matter to the attorney general for appropriate action. The commission will not hear an appeal if an affidavit is not filed within the time required."

6. 6 AAC 29.390(g) states:

"An affidavit timely filed with the commission will be considered at the next regular meeting of the commission. If a candidate or group's appeal is

(1) denied by the commission, commission staff will notify the candidate or group of its decision within 15 days, and require that the civil penalty originally assessed be paid within 30 days after the date of the letter containing notification of the commission's decision; or

(2) accepted by the commission, commission staff will notify the candidate or group of its decision within 15 days, informing him or it that the civil penalty assessment has been waived and the matter is considered closed; or

(3) accepted, in part, by the commission, commission staff will notify the candidate or group of its decision within 15 days, and require that the reduced civil penalty assessment be paid within 30 days after the date of the letter containing notification of the commission's decision."

7. 6 AAC 29.390(h) states:

"A candidate or group may appeal the commission's decision to deny or partially accept reasons for lateness to the superior court within 30 days after his receipt of the notice under Rule 45 of the Appellate Rules of the Alaska Court System. If no appeal is made within 30 days and no payment is made, the matter will be referred to the attorney general for appropriate action."

8. "Forfeiture" is used here in the sense of relinquishing something not legitimately obtained, *e. g.*, a "deprivation ... of a right in consequence of the nonperformance of some obligation or condition." Black's Law Dictionary 778 (rev. 4th ed. 1968).

9. Marshall also argued that the APOC failed to follow its general statutory and regulatory procedures. AS 15.13.120(b), dealing with the forfeiture sanction, requires only that a violation be alleged and tested in the supreme court. *See* note 2, *supra*. This has been done, and the other procedures were not prerequisites.

### A. Constitutionality of the Forfeiture Sanction [10]

Although rarely stated as plainly as Alaska's law, numerous other states have similar forfeiture provisions.[11] Several jurisdictions have declared these statutes unconstitutional on one of two grounds, neither of which applies here.

[redacted] The first group of cases is premised on a separation of powers concept. State constitutions uniformly [12] declare that the members of each state legislative house shall determine the election and qualifications of its members.[13] Construing this constitutional grant of authority as *exclusive*, courts reason that empowering the judiciary to investigate and declare an election void violates separation of powers. *See Dinan v. Swig*, 112 N.E. 91, 92, 93 (Mass.1916); *Combs v. Groener*, 256 Or. 336, 472 P.2d 281, 282–83 (1970). *Contra, State ex rel. La Follette v. Kohler*, 200 Wis. 518, 228 N.W. 895, 908–09 (1930). This approach, however, is inapplicable here. Marshall was elected to local legislative bodies. No constitutional provision grants these bodies the type of authority granted the state legislative houses regarding a member's qualifications and election. Thus even if the forfeiture sanction conflicts with art. II, sec. 12, of the Alaska Constitution insofar as state legislative elections are concerned, a question we do not reach,[14] it can nonetheless constitutionally apply to local elections. Although Article X of the Alaska Constitution, governing local governments, intends "maximum local self-government," and mandates that a "liberal construction shall be given to the powers of local government," art. X, sec. 1, no provision makes a grant of authority analogous to that found in art. II, sec. 12 (*see* note 13, *supra*). The statute in question establishes an election procedure and we have previously noted that "it is within the province of the legislature to establish election procedures." *Silides v. Thomas*, 559 P.2d 80, 89 (Alaska 1977). Further, the provision of the reporting requirements that allows a local government to opt out of coverage, *see* AS 15.13.010(a), saves the statute from any unconstitutionality premised upon a conflict with maximum local self-government.

[redacted] The second view holding forfeiture statutes unconstitutional interprets constitutionally specified qualifications for office as exclusive, and reasons that tying cam-

**10.** *The constitutionality of filing requirements* and deadlines was upheld in *Silides v. Thomas*, 559 P.2d 80, 89 (Alaska 1977). In that case, we held that failure to timely file a designation of treasurer statement was fatal to a candidacy, and thus affirmed the lieutenant governor's action in striking a state house candidate's name from the primary ballot due to his failure to file. We noted that "[u]nder Alaska's Constitution, it is within the province of the legislature to establish election procedures." *Id.* at 89. If the failure to timely file can legitimately keep a candidate out of the race, it is logical that a similar failure can legitimately keep him or her from assuming an office otherwise won. However, the constitutionality of the legislative act empowering this court to declare an election void was not at issue in *Silides*.

**11.** *See, e. g.*, Ky.Rev.Stat.Ann. § 121.990(10) (Baldwin Supp.1980); Md.Elec.Code Ann. § 26–18(f) (1957); Minn.Stat.Ann. § 210A.42 (West Supp.1981); Ore.Rev.Stat. § 260.355 (1979); Wash.Rev.Code Ann. § 42.17.390(a) (1981 Supp.). Each of these statutes adds a requirement not found in Alaska's law; *e. g.*, violation must be willful (Ky.); no forfeiture if failure to meet filing requirement found by court to be for just cause (Md.Elec.Code Ann. § 26–13(h)) (Supp.1979); no forfeiture unless candidate convicted for the gross misdemeanor of violating election laws (Minn.); no forfeiture unless violation "deliberate and material" (Oregon); no forfeiture unless violation "probably" affected the outcome (Wash.).

**12.** *See* Comment, The Legislature's Power to Judge the Qualifications of Its Members, 19 Vanderbilt L.Rev. 1410, 1410 & n.2 (1966).

**13.** Alaska's provision states:

> "Each [house] is the judge of the election and qualifications of its members and may expel a member with the concurrence of two-thirds of its members."

Alaska Const., art. II, sec. 12.

**14.** We note, however, that if the *Dinan* and *Combs* approach is taken, the forfeiture sanction would not apply to state legislative elections, yet would still apply to local elections, the governor, the lieutenant governor, and to a "judge seeking electoral confirmation." AS 15.13.010. This possible inconsistency argues for a uniform application.

paign disclosure requirements to the forfeiture sanction impermissibly adds qualifications for the office. *See Maloney v. Kirk,* 212 So.2d 609, 614 (Fla.1968) (split decision). A majority of courts, however, have rejected this view. *See Secretary of State v. McGucken,* 244 Md. 70, 222 A.2d 693, 695 (1966); *Saari v. Gleason,* 126 Minn. 378, 148 N.W. 293, 294–95 (1914), reaffirmed in *Pavlak v. Growe,* 284 N.W.2d 174, 177–78 (Minn.1979); *Laborer's Educational & Political Club-Independent v. Danforth,* 561 S.W.2d 339, 344 (Mo.1977); *State ex rel. La Follette v. Kohler,* 202 Wis. 518, 228 N.W. 895, 907–08 (1930). Two of these cases, however, did adopt this view to the extent they were confronted with a statutory scheme prohibiting the candidate from holding either the contested office or other public offices for a future period of time. The added qualification theory may more appropriately apply to such a situation, when qualifications are constitutionally-based, because such statutes may be construed as adding the condition that to qualify for office one must never have previously violated campaign laws.[15]

█ We are persuaded by those cases upholding the forfeiture sanction, which reason that rather than imposing impermissible eligibility requirements, the forfeiture sanction merely excludes those who obtain office by unlawful means, *i. e.,* in violation of campaign laws, and thus precludes them from reaping the benefit of their wrong. Our premise is that a valid election is an obvious, if unstated, constitutionally-based eligibility requirement for membership in a

legislative body. *See Pavlak,* 284 N.W.2d at 180 n.4. The legislature's authority to proscribe certain campaign practices and to promote fair elections, recognized by this court in *Silides,* 559 P.2d at 89, logically and necessarily implies the power to have unfair elections set aside. *Pavlak,* 284 N.W.2d at 177–78.[16] *See State ex rel. La Follette v. Kohler,* 202 Wis. 518, 228 N.W. 895, 907, 910 (1930).

Neither of the two theories underlying a finding of unconstitutionality apply to the facts of this case. The forfeiture sanction does not conflict with any constitutional provision delimiting the qualifications of assembly or council members, nor with any provision reserving exclusive authority to determine a member's election to those local entities. Thus we uphold the constitutionality of AS 15.13.120(b) on these facts.

### B. Absence of Regulations

█ The APOC is given rulemaking authority in AS 15.13.030(10).[17] Marshall argues that this provision requires the promulgation of regulations before his election can be declared void. The Master agreed, although not specifying what the regulations might add. Requiring regulations as a prerequisite to enforcement would extend a rule recognized under limited circumstances in *Falcon v. Alaska Public Offices Commission,* 570 P.2d 469, 480 (Alaska 1977), and in *Messerli v. State,* 626 P.2d 81, 88 (Alaska 1981), but rejected in *Silides v. Thomas,* 559 P.2d 80, 91 (Alaska 1977).

In *Silides,* two state house candidates' names were kept off the primary ballot due to asserted failures to timely file financial

---

**15.** *See Pavlak,* 284 N.W.2d at 177, 180; *Danforth,* 561 S.W.2d at 345; *State ex rel. Palagi v. Regan,* 113 Mont. 343, 126 P.2d 818, 826 (1942).

**16.** One case, dealing with a unique statutory procedure, took a third approach. In *Scheibel v. Pavlak,* 282 N.W.2d 843 (Minn.1979), the statute provided that the supreme court, after rendering a final decision, was to forward a copy to "the chief clerk of the house ... or the secretary of the senate, as appropriate," which body was to then make the ultimate determination of the election's validity. *Id.* at 848. In light of the decision's lack of finality under this scheme, the court concluded that the statute unconstitutionally provided for advisory opin-

ions, which in turn jeopardized separation of powers concepts. *Id.* at 848–50. *See also State ex rel. Smith v. District Court,* 50 Mont. 134, 145 P. 721, 722–23 (1914).

**17.** "The commission shall

   .     .     .     .

    (10) adopt regulations necessary to *implement and clarify* the provisions of AS 24.45 [Regulation of Lobbying], AS 39.50 [Conflict of Interest] and this chapter [State Election Campaigns], subject to the provisions of the Administrative Procedures Act." (emphasis added).
AS 15.13.030.

disclosure and appointment of campaign treasurer statements (required by AS 39.-50.020 and AS 15.13.060). 559 P.2d at 82–83. The candidate argued that the failure to promulgate regulations, per AS 15.13.-030(10), prevented him from knowing where to obtain the filing forms. Notwithstanding the allegation of actual confusion, which is not present in this case, we nonetheless rejected the candidate's argument:

> "Although it would have been preferable to have promulgated regulations, we do not think any regulations *were necessary* to implement the mandatory filing provisions established by AS 15.13.060(c)." (emphasis added).

*Id.* at 91.

This rule was modified in *Falcon*, where we refused to enforce a financial interest disclosure requirement until regulations were promulgated. *Falcon* involved a constitutional claim of privacy. The issue was whether a public official, who was also a doctor, was required to disclose patient's names as "sources of income." After first finding a privacy protection in favor of the patients, and weighing this against the legitimate purposes underlying disclosure, we concluded that absent protective regulations the disclosure law impermissibly infringed on a constitutionally protected zone of privacy. 570 P.2d at 480.[18] Finally, *Messerli* also required the promulgation of regulations where necessary to protect constitutional guarantees of free speech. 626 P.2d at 88.

Reading these cases together leads to the conclusion that the absence of regulations is not fatal to enforcement of the sanction unless "necessary" to implement the sanction or to protect a constitutional right. No constitutional claim analogous to that in *Falcon* or *Messerli* is argued here. Regulations detailing application of the forfeiture sanction would be helpful, but the issue here is whether they are "necessary." Regulations could add procedural prerequisites, *e. g.*, require explicit notice to the candidate that delinquent filing can or will result in forfeiture, as well as delineate when the sanction will apply. Further, regulations could add a mitigating aspect to the sanction. For example, the regulations pertaining to removal from office for failure to file financial disclosure create a "sliding scale" of sanctions based on the type of offense.[19]

---

18. The relevant statute, AS 39.50.050(b), provided:

> "The commission shall promulgate regulations to *implement and interpret* the provisions of this chapter; regulations or interpretation shall be within the intents and purposes of this chapter ...." (emphasis added).

19. The financial-interests disclosure statute requires two reports, one due 30 days after nomination or appointment, and one due "no later than April 15 or 15 days after" filing a federal income tax return (whichever is first) for each succeeding year. AS 39.50.020(a). AS 39.50.-060(b) states, in part:

> "Any person failing to or refusing to comply with the requirements of this chapter, in addition to the penalties described, shall forfeit his nomination to office and shall not be seated or installed in office if he has not complied."

AS 39.50.070, .080, and .110 detail this sanction as it applies to executive employees, commission or board members, and judicial officers.

The APOC regulations implementing these provisions provide for a continuum of sanctions:

(1) If the initial statement is not timely filed, the official or candidate is informed by certified mail that his report is delinquent and that he is subject to criminal penalties, the Department of Administration is requested to freeze pay, per diem and travel payments, and the attorney general is informed of the failure to file. *See* 6 AAC 29.115(a), .120(a).

(2) If the annual conflict-of-interest statement is not filed by April 15, the official is notified, and so is the attorney general. *See* 6 AAC 29.115(b), .120(b), .125.

(3) If the annual report becomes delinquent by 30 days, the official is notified he is delinquent "and that he is subject to removal from office," and the governor, judicial council, or attorney general [whichever is appropriate] is notified and requested to remove the official or, *in the case of the attorney general, requested to take appropriate action. See* 6 AAC 29.-115(c), .120(c), .125(b).

In addition, fines are imposed for late filing. *See* 6 AAC 29.110, .135.

As regards municipal officials, referral to the attorney general for appropriate action is made when reports are 30 days past due. *See* 6 AAC 29.140(a) and (b).

The controlling statute does not specify or require a scaling of sanctions. Arguably such

Even though potentially helpful, however, we do not view regulations as *necessary* to the application and enforcement of the forfeiture sanction. The statute calls for the sanction in plain language and prescribes procedurally how it is obtained.[20] The absence of regulations is not fatal.

## C. Scienter

■ Many forfeiture provisions require that a violation be deliberate, willful, knowing, or be committed with some type of scienter.[21] Alaska's statute contains no such provision, simply stating: (a) "[a] person who violates a provision of this chapter is guilty of a misdemeanor," AS 15.13.-120(a); and (b) the election "of a candidate who violates a provision of this chapter . . . is void. . . ." AS 15.13.120(b). Marshall asks that we read into the statute a requirement that violations, to be actionable, must be knowing or willful.

The act was amended several times. The original version of AS 15.13.120, defining violations and providing, *inter alia*, for forfeiture, did not require willfulness for a failure to report to constitute a violation, nor as a prerequisite to forfeiture. *See* SB 388, 8th Legis., 2d Sess. at 10 (Feb. 18, 1974). The bill did require that an illegal contribution be accepted "knowingly" for it to constitute a violation. *Id.* at 9. Comparison of these provisions shows that the legislature's omission of such a requirement regarding disclosure reports was deliberate. With the exception of one intervening version of the bill,[22] a scienter element was never added, and the statute has always read, in relevant part:

> regulations are beyond the power of the APOC and thus are not a legitimate exercise of delegated authority. *See State ex rel. Public Disclosure Comm'n v. Rains*, 87 Wash.2d 626, 555 P.2d 1368, 1372–73 (1976). Starting with the premise that agency rules cannot amend the statute, the court in that case held that the commission was without power to promulgate filing deadlines absent a specific statutory authority concerning filing deadlines, even though charged with the general authority to adopt clarifying regulations.

**20.** *See* note 2, *supra.*

"(a) A person who violates a provision of this chapter is guilty of a misdemeanor . . . . A violation includes but is not limited to . . . :

(1) failing to make a statement or report required to be made . . . , or failing to make a statement or report at the time . . . [it] is required . . . ;

   ·    ·    ·    ·    ·

(6) knowingly accepting a contribution in violation of sec. 70 . . . .

(b) The nomination for, or election to, an office of a candidate who violates a provision of this chapter . . . is void . . . ."

AS 15.13.120.

The absence of a scienter element in the federal campaign laws led to the conclusion that willfulness is not required. *See United States v. Finance Committee to Reelect the President*, 507 F.2d 1194, 1197 (D.C.Cir. 1974). A similar result obtains here. The statute contains no scienter requirement and on these facts we decline to impose one. Even were we to do so, Marshall's willfulness is inferable from his prior experience with the election filing requirements. Given that history, the Master's finding that the failure to file was "careless or neglectful" borders on being clearly erroneous.

## D. Application of the Forfeiture Sanction

■ Courts have taken various approaches in efforts to mitigate the forfeiture sanction. Some hold that while filing is mandatory, the deadline for doing so is directory; thus, a late report is not a violation and the election is valid. *See Salley v. Smith*, 201 S.C. 338, 23 S.E.2d 6, 8 (1942); *Sjostrom v. Bishop*, 15 Utah 2d 373, 393 P.2d 472, 474 (1964).[23] These cases, how-

**21.** *See* note 11, *supra.*

**22.** In HCS CSSB 388 8th Legis., 2d Sess. (Mar. 14, 1974), substantially a campaign finance-limitation bill, a "wilful violation" with the candidate's "knowledge" was a precondition to forfeiture. *Id.* at 13. This version was subsequently rejected.

**23.** Building from these cases, the Master recommends that the *sanction* be considered directory rather than mandatory. No located case adopts such an analysis.

In addition to *Salley*, the Master relied on *Best v. Sidebottom*, 270 Ky. 423, 109 S.W.2d

ever, dealt with post-election reports, which could not affect the election whether timely or delinquent. Pre-election reports, on the other hand, do provide the electorate with information that may affect its decision; manifestly the timeliness of those reports is critical. The *Sjostrom* court relied on this reasoning in excusing a delinquent post-election report:

> "Where statutes governing the conduct of elections require something to be done before the election, so it might have some influence on the election's outcome, it is usually held that the time requirement is mandatory."

393 P.2d at 474. We have previously stated that election law filing deadlines are mandatory,[24] and therefore substantial compliance is not sufficient, absent substantial confusion or "impossibility." *Silides*, 559 P.2d at 86 (lack of clarity and impossibility warranted application of substantial compliance doctrine where one statute required that financial disclosure statement be filed in Anchorage, while other allowed declaration of candidacy to be filed in Juneau, but former statute contemplated contemporaneous filing; held: sufficient if report for Anchorage is in mail by due date). There are no allegations of substantial confusion or impossibility; the deadline for filing the report was mandatory and we agree with the Master's finding that Marshall's failure to timely file violated the election reporting statute.

█  Another approach has been to recognize the validity of a forfeiture sanction,

but to construe forfeiture as not applying when violations are technical, trivial, or insubstantial, or could not have affected the election. *See State ex rel. Hampel v. Mitten,* 227 Wis. 598, 278 N.W. 431, 434 (1938). *Contra, Cook v. Corbett,* 251 Or. 263, 446 P.2d 179, 184 (1968). Marshall's violation, filing a pre-election report long after the election, however, cannot be characterized as trivial and thus we need not resolve at this time whether a "trivial" violation can preclude applying the forfeiture sanction.

Disclosure of campaign contributions, and to a lesser extent of expenditures, serves substantial interests, which have been ably articulated by the United States Supreme Court:

> "First, disclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voter in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.
>
> Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light

---

826 (1937). The precise issue in *Best* was whether a candidate could amend a pre-election expenditure statement after the election to "cure" the report (which was inaccurate, but timely) so as to avoid forfeiture. The court held he could. Whatever relevance *Best* holds here was eliminated by a subsequent opinion from the same jurisdiction. In *Dempsey v. Stovall,* 418 S.W.2d 419 (Ky.1967), the court held an election void for the failure to file pre-election reports until after the election, stating:

> "The filing of financial reports . . . is a mandatory requirement. . . . It is patent that a failure to file reports and designations required by the act until after the date of the Primary cannot be deemed compliance, substantial or strict. In this state of case, it

would be to emasculate the salutory provisions of the act to permit appellee . . . to receive the benefits of the nomination obtained in flagrant violation of the law's clear provisions."

*Id.* at 422. The court then declared the candidate's nomination election void.

**24.** *Silides v. Thomas,* 559 P.2d at 85 n. 12. *Accord* 2A C. Sands, Sutherland Statutory Construction § 57.21 (4th Ed. 1973):

> "Provisions of statutes governing the conduct of elections which have the purpose of securing a complete and enlightened vote or preventing fraud, where failure to comply is capable of influencing the outcome of the election, are mandatory."

of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return. And, as we recognized in *Burroughs v. United States*, [290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484] ... Congress could reasonably conclude that full disclosure during an election campaign tends 'to prevent the corrupt use of money to affect elections.' In enacting these requirements it may have been mindful of Mr. Justice Brandeis' advice:

'Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.'

Third, and not least significant, record-keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above.

The disclosure requirements, as a general matter, directly serve substantial governmental interests." (citation and footnotes omitted).

*Buckley v. Valeo*, 424 U.S. 1, 66–68, 96 S.Ct. 612, 657–658, 46 L.Ed.2d 659, 715 (1976),[25] quoted in *Messerli v. State*, 626 P.2d 81, 85 (Alaska 1981).

Failure to file reports required *before* the election frustrates these purposes, and presents a most egregious violation of campaign reporting laws. The deadlines for filing are mandatory, and the plain meaning of the statute makes the forfeiture sanction applicable. The only indication that the legislature may not have meant what it plainly said is whatever guidance is inferable from the fact the statute was passed in order to preclude a vote on a substantially similar initiative. *See Warren v. Boucher*, 543 P.2d 731 (Alaska 1975). In *Warren*, this court compared the disclosure legislation with the disclosure initiative and found them substantially similar; the initiative was therefore kept off the ballot. *Id.* at 735, 739–40. The dissent pointed out various differences, including that the act eliminated many enforcement provisions found in the initiative.[26] Arguably this evidences a legislative intent to have a weakly enforced act; however, the statutory language is clear and must prevail over tangential inferences. Further, we noted in *Warren* that "certain violations under each measure work a forfeiture of nomination or election." 543 P.2d at 737. If the legislature intended non-strict application, it could have so provided.

The statutory forfeiture of office provision applies here by its own clear language to Marshall's election. His violation was significant. His 1980 seven-day pre-election report was not simply a few days late; rather, it was not filed until well after the election. The sanction is a perfectly valid legislative enactment,[27] and the fact that its

**25.** *See also Brown v. Superior Court*, 5 Cal.3d 509, 96 Cal.Rptr. 584, 487 P.2d 1224, 1234 (1971) (insuring a better informed electorate, through disclosure, is a compelling state interest); *State v. (1972) Dan J. Evans Campaign Comm.*, 86 Wash.2d 503, 546 P.2d 75, 78 (1976) (the purpose of contribution disclosure is to inform the public and elected representatives of expenditures by persons whose purpose is to influence or affect government decisionmaking).

**26.** For example, the legislature eliminated "[a]lmost all individual penalties for enforcement," *Warren*, 543 P.2d at 741; and eliminated

"[a]ll power of the watchdog committee to delay certification of candidates or to bring charges requiring a delay of certification ... [and eliminated] the power of the court to declare the second highest vote-getter elected where expenditure violations were found." (footnotes omitted). *Id.* at 742.

**27.** Numerous courts have either recognized the validity of a forfeiture sanction, *see Laborer's Educational & Political Club-Independent v. Danforth*, 561 S.W.2d 339, 344 (Mo.1977); *State ex rel. Palagi v. Regan*, 113 Mont. 343, 126 P.2d 818, 825 (1942); *State ex rel. La Follette v. Kohler*, 228 N.W. 895, 907, 910 (Wis. 1930); or have applied it to election law violations. *See Dempsey v. Stovall*, 418 S.W.2d 419, 422 (Ky.1967) (failure to file pre-election report until after election compelled forfeiture);

application may have unpleasant consequences for an otherwise duly elected official does not justify interpreting it in a manner incompatible with the plain meaning of the statute.[28]

Marshall's election to the city council for the City of Fairbanks and to the assembly for the Fairbanks North Star Borough is declared void.

*Secretary of State v. McGucken*, 244 Md. 70, 222 A.2d 693, 695–97 (1966) (failure to timely appoint campaign treasurer designation compelled forfeiture); *Cook v. Corbett*, 251 Or. 263, 446 P.2d 179, 185 (1968) (false statements in ads were deliberate and material violations and compelled forfeiture), modified in *Combs v. Groener*, 256 Or. 336, 472 P.2d 281, 282–83 (1970) (forfeiture sanction unconstitutionally infringes legislature's exclusive power to determine members' election, except as applied to primary contests, which was the situation in *Cook*).

28. We reject Marshall's argument that because the sanction has never been enforced before it cannot now be applied. Equal protection is not violated by unequal enforcement of a valid law absent a showing of intentional discrimination. *Silides v. Thomas*, 559 P.2d 80, 89 (Alaska 1977). No such showing has been made here.