DIVISION OF ELECTIONS OF the STATE of Alaska, Appellant,

v.

Judge Karl S. JOHNSTONE, Alaska Court System and Alaska Judicial Council, Appellees.

Daniel R. DE NARDO, Appellant,

v.

ALASKA COURT SYSTEM, Alaska Judicial Council, and State of Alaska, Appellees.

Nos. 7231, 7232.

Supreme Court of Alaska.

July 22, 1983.

**538**

Wilson L. Condon, Atty. Gen., Thomas M. Jahnke, Asst. Atty. Gen., Juneau, for appellant, Div. of Elections.

Robert H. Wagstaff, Anchorage, for appellees.

Daniel R. DeNardo, in pro. per.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

Karl Johnstone was appointed by the governor on October 8, 1979, to fill a vacant superior court seat in the Third Judicial District. Judge Johnstone assumed office on December 13, 1979.

The primary issue in this appeal is: Given the above dates, when was Judge Johnstone required to run for retention under Alaska law? The Alaska Court System and the Alaska Judicial Council, later joined by Judge Johnstone,[1] filed suit in the superior court on October 4, 1982, seeking a declaratory judgment that Johnstone was not required to run in his first retention election until 1984.[2] The Division of Elections of the State of Alaska opposed the claim, and argued before the trial court that Johnstone was required to stand for retention in 1982. Daniel R. DeNardo, a private citizen, was joined as an intervening plaintiff in the above action.[3] The superior court granted summary judgment on behalf of Johnstone on October 20, 1982. Although Johnstone's name had already been printed on the 1982 ballot,[4] the court ruled that the votes cast were not to be counted, and that Johnstone was not required under the Alaska Constitution to stand for retention until 1984. An immediate appeal was taken by the Division of Elections.

In an expedited proceeding, we heard oral argument and issued an order on October 29, 1982, reversing the superior court, and requiring Judge Johnstone "to stand for retention in the forthcoming general

1. The Division of Elections and intervenor Daniel R. DeNardo asserted that the original named plaintiffs in the suit lacked standing, and that the real party in interest was Judge Johnstone. In a letter to the superior court on October 19, 1982, Johnstone agreed "to be bound by the decisions of the courts of this state in this case as if I were a party." The superior court joined Johnstone in the action on the same day, with consent of counsel.

2. The complaint filed by the court system and judicial council stated that Johnstone was not required to run until 1986, but this date was modified to 1984 before the superior court.

3. Mr. DeNardo argued that Judge Johnstone had been required under the constitution to run for retention in 1982, but that he was barred from running because he had failed to file his

candidacy in time under AS 15.35.070. See infra Part II of this opinion. Mr. DeNardo's position was that, because Judge Johnstone should not be permitted to run in 1982, his seat on the bench would become vacant 90 days after the 1982 election, in accordance with article IV, section 7 of the Alaska Constitution. See infra note 11 and accompanying text.

4. Johnstone placed his name on the ballot in response to an opinion issued by the Attorney General that Johnstone was required to run in 1982 under the Alaska Constitution. Apparently, by the time of the summary judgment order it was already physically too late to remove Johnstone's name from the printed ballots.

election."[5] We set forth today the full opinion of the court in explication of that decision.

## I. THE LAW OF APPOINTMENT.

Article IV, section 6 of the Alaska Constitution provides:

*Approval or Rejection.* Each supreme court justice and superior court judge shall, in the manner provided by law, be subject to approval or rejection on a non-partisan ballot at the first general election held more than three years after his appointment. Thereafter, each supreme court justice shall be subject to approval or rejection in a like manner every tenth year, and each superior court judge, every sixth year.

The central question presented in this appeal is: When does appointment take place within the meaning of the above section? The superior court ruled that the date of appointment is "the date upon which a judge assumed office." The superior court concluded that it was the constitutional framers' intent that the three-year clock for retention elections not start running until the judge actually has taken office, that this is the operative date in the beliefs of "a majority of the persons who have given any thought to the subject," and that it was "likely" that a majority of the Alaskan voters would have expected "that time in office was the relevant time frame." We disagree with the conclusion of the superior court, and reverse.

Examination of the bases of the parties' arguments is an appropriate starting point for our analysis. The first level of dispute is one of category. Appellees urge us to

find that the word "appointment" has a variety of meanings. They suggest that an appointment becomes "effective" only upon actual installation in office, at which point starts the three-year clock for retention elections. The Division of Elections disagrees with this reasoning, and asserts that the common usage of the word "appointment" encompasses only "the act of designation by the governor."

We find the plain meaning argument advanced by the Division persuasive. Black's Law Dictionary 128 (4th ed. 1968), defines "appointment" as follows:

The selection or designation of a person, by the person or persons having authority therefor, to fill an office or public function and discharge the duties of the same.

Similarly, Webster's Third New International Dictionary (Unabridged) 105 (1961), defines appointment as "designation of a person to hold a nonelective office or perform a function . . . ."

■ As a general rule, we have held that, "[u]nless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage." *State v. Debenham Electric Supply Co.,* 612 P.2d 1001, 1002 (Alaska 1980); *Lynch v. McCann,* 478 P.2d 835, 837 (Alaska 1970).[6] Adherence to the common understanding of words is especially important in construing provisions of the Alaska Constitution, because the court must "look to the meaning that the voters would have placed on its provisions." *State v. Lewis,* 559 P.2d 630, 637–38 (Alaska), *appeal dismissed,* 432 U.S. 901, 97 S.Ct. 2943, 53 L.Ed.2d 1073–74

---

**5.** Our order reads in part as follows:

The Judgment of the superior court is reversed. "[A]ppointment" as that term is used in article IV, section 6 of the Alaska Constitution, means designation by the Governor of the State of Alaska. Therefore, Judge Karl S. Johnstone, who was appointed on October 8, 1979, is required to stand for retention in the forthcoming general election.

In view of the rational disagreement regarding a first impression question of constitutional [sic] adjudication concerning the meaning of "appointment" as used in article

IV, section 6, and the particular circumstances of this case, compliance with AS 15.35.070 and AS 22.10.150 are waived.

Therefore, Judge Karl S. Johnstone's name shall appear on the general election ballot for November 2, 1982, and ballots cast in regard to his approval or rejection shall be counted.

Opinions will follow.

**6.** AS 01.10.040 provides in part: "Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage."

(1977). *See also Thomas v. Bailey,* 595 P.2d 1, 4 n. 15 (Alaska 1979); *Plumley v. Hale,* 594 P.2d 497, 500 n. 6 (Alaska 1979).

 Significantly, the Alaska Constitution contains a juxtaposition of provisions both employing the word "appointment." Article IV, section 5, states that:

> The governor shall fill any vacancy in an office of supreme court justice or superior court judge by *appointing* one of two or more persons *nominated* by the judicial council.

(Emphasis supplied.) Here, the verb "to appoint" is used quite clearly within the constitutional text to mean "to designate for office." Article IV, section 6, it will be remembered, provides that a new judge will stand for retention "at the first general election held more than three years after his appointment." We think that absent some conclusion that the same word is used in a different context warranting a divergent construction, the word "appointment" has the same meaning in article IV, sections 5 and 6. *See Chugach Natives, Inc. v. Doyon, Ltd.,* 588 F.2d 723, 725–26 (9th Cir. 1978).

Finally, we note that our interpretation of article IV, section 6, is consistent with our earlier decision of *Delahay v. State,* 476

7. In *Delahay,* we ruled that a letter sent by the governor to the chief justice stating that the governor was appointing Arthur L. Robson as a district judge constituted a valid appointment of Robson.

8. Other cases subscribing to the "last act" rule include *United States v. Le Baron,* 19 How. (60 U.S.) 73, 78, 15 L.Ed. 525, 527 (1856); *Molnar v. City of Aurora,* 38 Ill.App.3d 580, 348 N.E.2d 262, 264 (1976); *McChesney v. Sampson,* 232 Ky. 395, 23 S.W.2d 584, 587 (1930); *Smith v. State,* 200 Miss. 184, 26 So.2d 543, 544 (1946); *Thomas v. McGrath,* 145 N.J.Super. 288, 367 A.2d 898, 901–02 (App.1976), *rev'd on other grounds,* 75 N.J. 372, 382 A.2d 1121 (1978).

9. AS 15.35.070 provides:
> *Filing declaration by superior court judge.* Each judge seeking retention in office shall file with the director a declaration of candidacy for retention not less than 90 days before the date fixed for the general election at which approval or rejection is requisite.

10. AS 22.10.150 provides:

P.2d 908 (Alaska 1970), *appeal dismissed,* 402 U.S. 901, 91 S.Ct. 1381, 28 L.Ed.2d 642 (1971).[7] Our ruling comports also with a long line of case law, dating back to *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803), holding that an appointment is effective when the "last act" required of the appointing authority has been completed.[8]

## II. APPROPRIATE REMEDY.

 Having determined that the date of Judge Johnstone's appointment was October 8, 1979, the date of his designation for office by the governor, we conclude that article IV, section 6, of the Alaska Constitution requires Johnstone to run for retention in November 1982, the first general election held more than three years after his appointment. This holding raises additional questions.

Johnstone's name appeared on the 1982 ballot because he filed his candidacy shortly before the ballots were sent to the printer. Despite meeting this practical deadline, however, the filing was approximately two months late under AS 15.35.070.[9] Because of this delay, the judicial council was unable to conduct an evaluation of Judge Johnstone as required by AS 22.10.150.[10]

> *Approval or rejection.* Each superior court judge is subject to approval or rejection as provided in the Alaska Election Code (AS 15.05). The judicial council shall conduct an evaluation of each judge before the retention election and shall provide to the public information about the judge and may provide a recommendation regarding retention or rejection. Such information and any recommendation shall be made public at least 60 days before the retention election. The judicial council shall also provide such information and any recommendation to the office of the lieutenant governor in time for publication in the election pamphlet under AS 15.58.050. If a majority of those voting on the question rejects the candidacy of a judge, the rejected judge shall not for a period of four years thereafter be appointed to fill any vacancy in the supreme court, court of appeals, superior court, or district courts of the state.
>
> The Alaska Judicial Council, created by article IV, section 8 of the Alaska Constitution, is a seven-person body consisting of three attorney members, three non-attorney members, and the chief justice of the supreme court. The judicial

The parties proffer three potential remedies before this court. Intervenor DeNardo asserts that Johnstone's lateness in filing made him ineligible for retention in 1982. Because the constitution required Johnstone to run in 1982 or forfeit his seat, DeNardo argues that Johnstone's term of office must be held to expire ninety days after the general election of November 2, 1982, in accordance with article IV, section 7, of the Alaska Constitution.[11] The Division of Elections suggests that such a harsh remedy would be inappropriate in this case, and puts forth two alternatives. First, the Division suggests that this court could invoke the doctrine of "excuse"[12] to waive compliance with the statutory election procedures in this case, and allow Johnstone to run in 1982 despite his failure to comply with AS 15.35.070. Second, the Division suggests that Johnstone could be exempted from the command of article IV, section 6, and not be required to run for retention until 1984.[13]

The Division places heavy reliance upon the factual background of this case in support of its position that it would be unduly harsh to hold that Johnstone's seat on the superior court should be forfeited because of his failure to anticipate our ruling in this case. There was no evidence that Johnstone's failure to file his candidacy in a timely manner was a deliberate attempt to circumvent the requirements of the constitution, or even that it had been the result of carelessness. The record demonstrates that Johnstone had made inquiry into the requirements of article IV, section 6, and had been informed by several state officials that he was not required, and indeed was not eligible, to run for retention until 1984.

In late June or early July of 1982, Johnstone was informed by Frank Raye, Personnel Director for the Alaska Court System, that he was not "eligible" for retention election until 1984. Judge Johnstone also received a courtesy copy of a letter from Mr. Raye to Marcy Rehfeld of the Division of Elections dated July 6, 1982. In that letter Mr. Raye purported to repeat representations made by Ms. Rehfeld to the effect that Judge Johnstone would not be on the 1982 ballot.[14] Johnstone was twice told

---

council's primary responsibility is the nomination of candidates for judicial appointments. *See supra* article IV, section 5 of the Alaska Constitution. Article IV, section 9 provides that the council will perform additional duties:
> The judicial council shall conduct studies for improvement of the administration of justice, and make reports and recommendations to the supreme court and to the legislature at intervals of not more than two years. The judicial council shall perform other duties assigned by law.

11. Article IV, section 7 provides:
> *Vacancy.* The office of any supreme court justice or superior court judge becomes vacant ninety days after the election at which he is rejected by a majority of those voting on the question, or for which he fails to file his declaration of candidacy to succeed himself.

12. The Division reported that "there is a substantial body of case law which supports the proposition that where a candidate relies on erroneous information supplied by state officials charged with administration of the election laws and is caused to miss a mandatory deadline or omit to follow a mandatory procedure, the candidate is 'excused' from the requirement." *See State v. Meier,* 115 N.W.2d 574 (N.D.1962); *Mihlbaugh v. Bogart,* 73 Ohio

App. 47, 53 N.E.2d 75 (1943); *In re Welsh,* 458 Pa. 645, 327 A.2d 6 (Pa.1974); *Clegg v. Bennion,* 122 Utah 188, 247 P.2d 614 (1952); *Ryshpan v. Cashman,* 132 Vt. 628, 326 A.2d 169 (1974); *Donohoe v. Shearer,* 53 Wash.2d 27, 330 P.2d 316 (1958). In *Ryshpan,* the Vermont Supreme Court summarized its reasoning as follows:
> Justifiable reliance on erroneous actions on behalf of the State has put one or more of its citizens in inescapable conflict with the literal terms of one of the time requirements instituted by that same sovereignty. Since to support the results of that mistake is to violate the expressed policy of the Legislature and do harm to the rights of a citizen candidate as well as the rights of the voting population generally, the statutory time schedule must be, as a matter of equity, and in the presence of minimal prejudice, required to yield.

326 A.2d at 171.

13. Judge Johnstone, the court system, and the judicial council did not address the problem of remedy in their brief. Nevertheless, we think that the other parties set forth the full range of available remedial alternatives before this court.

14. This letter read in part:

by an unidentified judicial council employee that he would not have to run for retention in 1982.[15] At the request of Mr. Raye, court system counsel Karla Forsythe prepared a legal memorandum on the question. It was her opinion that "appointment" refers to the time when one starts work.[16] In 1981, Johnstone contacted Al Szal, Area Court Administrator of the Third Judicial District, who repeated the Court System view that appointment occurred when a judge started working. Judge Johnstone also contacted Penelope Burke, the Third Judicial District Election Supervisor for the Division of Elections, sometime in 1982. Ms. Burke told him that his name would not appear on the ballot until 1984 because he had not started work until December 1979, and that this was consistent with past practice.[17]

We have held that, in an appropriate case, this court may exercise its "unfettered discretion" to apply a particular ruling in a purely prospective manner. *Warwick v. State ex rel. Chance,* 548 P.2d 384, 393 (Alaska 1976). *Warwick* set forth a detailed test for determining when the balancing of equities in a given case justified restricting the court's decision to prospective application. In *Warwick* we held that the appointment of a former state legislator to executive office was invalid under article II, section 5 of the Alaska Constitution.[18] We further held that the decision would be given full retroactive application. 548 P.2d at 396. If, however, we had reached an opposite conclusion with respect to retroactivity, we would have held that our decision "should not be applied to any appointments . . . prior to our decision." *Id.* at 393.

Drawing a direct analogy to the instant case, it is evident that Judge Johnstone's situation presents a variation upon the cir-

---

This is to confirm our telephone conversation of July 6, 1982, during which you informed me that Judge Karl Johnstone will *not* be on the ballot for retention election in 1982. Our records clearly indicate that Judge Johnstone's appointment date is December 13, 1979. Why there was a confusion to begin with I do not know. Furthermore, I do not know where the press is getting information that Judge Johnstone will be up for retention election this year. I have asked Martha Bender of the Judicial Council to contact the Anchorage newspapers to ask them to stop printing this misinformation.

15. Judge Johnstone stated that he twice called the judicial council in the early summer of 1982 and that on both occasions "the woman who answered the telephone" told him that his name would not appear on the 1982 ballot.

16. Ms. Forsythe's memorandum stated in part:
[A]lthough the appointment might be effective as a "valid designation" of who is to be a judge, the actual effective date of the appointment in terms of service as a judge would be determined as of the date the judge begins work.
. . . .
Constitutional provisions for retention elections provide a system in which judges will be accountable for their performance in office. *Buckalew v. Holloway,* 604 P.2d 240, 244 (1979). There may be a substantial period of time between the governor's announcement of an appointment and the date upon which a judge begins work. Since the focus is upon performance, the constitutional intention is met by delineating for purposes of retention elections a time period during which the judge actually performs.
I conclude that a judge's appointment date is the date the judge actually starts work.

17. Ms. Burke stated in her affidavit that:
I would have made clear to Judge Johnstone the following facts: that his name would not appear on the ballot because the personnel department of the court system informed the division of elections that he was appointed in December 1979; that the selection of the date he started work rather than some other date was a selection made by the court system, not by the division of elections; and that the "past practice" in this regard was the court system practice of preparing a list of judges' names with their employment dates rather than the dates of the governor's appointments.

18. Article II, section 5 of the Alaska Constitution provides in part:
During the term for which elected and for one year thereafter, no legislator may be nominated, elected, or appointed to any other office or position of profit which has been created, or the salary or emoluments of which have been increased, while he was a member.
Warwick had sat in the state legislature which increased the salary of the state Commissioner of Administration from $33,000 to $40,000. Warwick subsequently resigned from the legislature and was appointed by the governor to

cumstances of *Warwick.* Our equitable concern here is not focused upon the direct force of the ruling that Judge Johnstone was required to stand for retention in 1982. That he is able to do. Rather, we must confront the indirect consequence of the decision, namely that it operates to place Judge Johnstone in noncompliance with AS 15.35.070, which in turn renders impossible compliance by the judicial council with AS 22.10.150. The question presented is not whether justice requires that Johnstone be excused from the primary effect of our decision, but whether it requires that he be excused from the residual, secondary effects of the decision.

Our analysis in *Warwick* rested in part upon the principle that injustices stemming from the pronouncement of new law should be avoided.[19] Occasionally, a situation will be presented in which it is necessary to lay down a rule for the direction of future actions, but where all attempts to apply the new rule to past conduct results in disarray. Former actors, uninformed of the rule of conduct, failed to behave as they rationally would have behaved if they had anticipated the new law. The doctrine of prospectivity, when properly invoked, attempts as best it can to repair the situation created by such incongruous past behavior. In this regard, we think that there is no distinction to be made between the immediate effects attending the creation of a new law, and the secondary breaches of existing law that sometimes can be created by the announcement of a new legal principle. In resolving the present case, we conclude that where a new decision has been rendered on an issue of constitutional law, and where the effect of that decision is to place a litigant in violation of related statutory provisions, ap-plication of those statutes may be waived if circumstances exist which would otherwise justify a purely prospective ruling regarding the constitutional issue.

■ It remains to be determined whether, under the standards set forth in *Warwick,* Judge Johnstone should have been excused from his noncompliance with the filing requirements of AS 15.35.070. The United States Supreme Court, in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296, 306 (1971), set forth three types of considerations to be weighed in determining whether a new ruling of civil law should be given prospective or retroactive force:

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity".

(Citations omitted.) *Accord, Warwick,* 548 P.2d at 394; *Schreiner v. Fruit,* 519 P.2d 462, 466–67 (Alaska 1974). We must deter-

---

serve as Commissioner of Administration. 548 P.2d at 386.

**19.** We stated that "[c]onsideration is given to applying a ruling prospectively 'whenever injustice or hardship will thereby be averted,' " 548 P.2d at 393–94, *quoting Great Northern Ry. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360, 366 (1932). We noted that the avoidance of injustice was the foundation of Justice Cardozo's advocacy of prospectivity. We quoted from B. Cardozo, The Nature of the Judicial Process (1921):

> [I]n the vast majority of cases the retrospective effect of judge-made law is felt either to involve no hardship or only such hardship as is inevitable where no rule has been declared. I think it significant that when the hardship is felt to be too great or to be unnecessary, retrospective operation is withheld.

*Id.* at 146–49, *quoted in Warwick,* 548 P.2d at 395.

mine which of the proffered remedies should be selected in light of the three considerations set forth in *Chevron.*

Treating the *Chevron* factors in turn, we conclude that interpretation of article IV, section 6 is "an issue of first impression whose resolution was not clearly foreshadowed." No prior Alaska case has attempted to construe the meaning of the word "appointment" in terms of its function of starting the clock on the first pre-retention term for a new judge. The collection of opinions Judge Johnstone received to the effect that his appointment for this purpose was the day he took office, although in conflict with our resolution of this question, indicated the presence of real uncertainty. The decision of the superior court in this case, while it was rendered too late to have influenced Johnstone's actions, is further support for the proposition that article IV, section 6 was subject to varying constructions.[20]

We therefore conclude that the first of the considerations from the *Chevron* case militates against an unjust retroactive application of our holding. While we believe this conclusion weighs in the direction of allowing Judge Johnstone to run in a retention election at some time (rather than requiring his retirement from the bench), this factor alone does not provide a basis for selecting either 1982 or 1984 as the appropriate election year for Judge Johnstone.

Turning to the second factor under *Chevron,* we look to the purpose of the rule created in order to ascertain whether its operation would be retarded or advanced by affording it retrospective effect. The purpose of article IV, section 6 was to set a length of time for the first term of a superior court judge, after which the electorate would be given an opportunity to pass upon his or her judicial performance.[21] We conclude that the primary purpose of article IV, section 6, to give the electorate the right to pass judgment upon the performance of judicial officers, would not be served by according our holding a mechanistic application. Adoption of the intervenor's position would result in the removal of Judge Johnstone from the bench with no input whatever from the voters, who under the scheme of article IV, section 6 were given ultimate authority to retain or reject a superior court judge.

In addition, the effect of article IV, section 6 is to set a specific date for the first retention election of each newly-appointed judge. In accordance with our holding, that date for Judge Johnstone is November 2, 1982. It is thus within the literal purpose of article IV, section 6 to require that Johnstone stand for retention in 1982 rather than 1984.

Finally, the framers of article IV, section 6 intended it to operate as a compromise between the lifetime tenure system of the federal judiciary and the desire to make state court judges accountable to the populace. In particular, the intention was expressed at the Constitutional Convention that article IV, section 6 should offer potential judges a reasonably long first term in order to provide a measure of job security sufficient to attract meritorious candidates to the bench.[22]

---

**20.** The superior court noted that "[i]t appears to be conceded that there is no case precedent although the term 'appointment' has frequently been defined in other contexts." The court concluded that the *Marbury* line of cases, *see supra* note 8 and accompanying text, was inapplicable to the present context.

**21.** *See infra* note 22.

**22.** Judiciary Committee Chairman McLaughlin characterized proposed article IV, section 6 as follows:

[I]t is the best compromise and the best solution to a vexing problem between those who feel we should have lifetime tenure so the judge can be absolutely independent or whether we should have short terms so the judges could be subject to popular will.

Minutes of the Constitutional Convention at 586. The compromise solution was seen as preserving the best features of the federal lifetime tenure system while providing for some measure of judicial accountability. The chief advantages of lifetime terms were seen by the framers as two: (1) the creation of an independent judiciary, and (2) the attraction of qualified members of the bar to the bench. *Id.* at 586. With respect to the former, Chairman McLaughlin said:

In accomplishing their objective, however, the framers created an imprecise vehicle. No matter how it is construed, article IV, section 6 can operate in the particular case to authorize a first term for a superior court judge of anywhere from three to five years.[23] This wide disparity in application is not affected by our decision in the instant case. Because of the broadness of the provision, we find that the general policies and compromises that went into its inclusion in Alaska's constitution are neither served nor disserved by choosing one date as opposed to the other for Johnstone's retention election. If we require Johnstone to run in 1982, his first term will be approximately three years in length; if he does not run until 1984, he will serve approximately five years. Neither result would contravene the intent underlying article IV, section 6.

In applying the second *Chevron* factor we are therefore left with the firm conviction that Johnstone should be permitted to run for retention at some point, and that the literal intent, if not the broad purpose, of article IV, section 6 suggests that he should be required to run in the 1982 election.

The third and final inquiry under *Chevron* is "whether a holding of retroactivity would cause substantial inequitable results,

injustice or harm." *Warwick,* 548 P.2d at 395 (footnote omitted). A holding resulting in the ouster of Judge Johnstone from office would work an extreme hardship. Such a result would have been significantly out of line with any "fault" on the part of Johnstone in failing correctly to predict our ruling. In this regard, the Division of Elections suggests that this court should find that Judge Johnstone reasonably relied upon the statements of various state officials in reaching his determination that he was not eligible for candidacy in 1982.[24] We do not consider it necessary to pass formally upon the reasonableness of Judge Johnstone's reliance.[25] We do, however, conclude that Judge Johnstone's reliance, even if misplaced, was not so serious an error of judgment as to warrant an effective forfeiture of his office.

There are equitable considerations, however, other than those pertaining to Judge Johnstone himself. The voters of the Third Judicial District have an interest in the constitutional and statutory procedures that have been created for retention elections. We previously discussed one aspect of this interest in observing that the electorate has a constitutionally created interest in periodically passing upon the retention of judicial

---

I am a partisan myself, but I don't believe that our judiciary should be subject to the influences where they would have to go to any clubhouse to secure their nomination or have to secure funds and sometimes excessive and exorbitant funds for the purposes of being elected. I might also point out that one of the dangers of the elective system is the fact that a judge whenever he makes a decision, he has to keep peering over his shoulder to find out whether it is popular or unpopular.

*Id.* at 584. With respect to the second advantage, Chairman McLaughlin said that:

It was the view of the Committee that in order to attract good men to become candidates, the only way we could assure the attraction of good candidates was to assure them they would be in office at least for a period of three and one-half years.

*Id.* at 586.

23. If Judge Johnstone had been appointed one day after election day in 1979, even under the position advanced by the Division in this case, he would not have been required to run for

retention until 1984, after nearly five years. If, however, he had been appointed one day before the 1979 election, his first term would still have ended, as here, with the 1982 election.

24. The Division of Elections asks this court to restrict carefully any holding on the reasonableness of Johnstone's reliance to the specific facts of this case. The Division's concern stems from the fact that Johnstone never received a direct communication from the Division itself to the effect that he was not required to run in the 1982 election. The Division evidently wishes to avoid the encouragement of future reliance upon non-authoritative state sources by candidates seeking to understand the election laws. We note the caveat made by the Division.

25. Since our interpretation of article IV, section 6 constitutes "an issue of first impression whose resolution was not clearly foreshadowed," a determination of the reasonableness of Judge Johnstone's reliance is not a precondition to resolution of the prospectivity question in the case at bar.

officers. We believe that this interest can only be served by affording the voters at some point the opportunity to cast their ballots for or against Judge Johnstone. In light of this conclusion, the question becomes one of timing. Given the choice of two imperfect outcomes, should Judge Johnstone be required to run in 1982 or in 1984?

We conclude that 1982 is the year that Judge Johnstone should stand for retention election, since it is the year he is required to run under the constitution. Selection of 1984 as the appropriate year would result in the suspension of the operation of a constitutional mandate, and a denial of the voters' opportunity to retain or reject Judge Johnstone at the precise time prescribed by the constitution.

We prefaced our discussion in this section with the observation that no solution reached in this case would be wholly satisfactory. While we recognize the defects inherent in short-circuiting the statutory procedures for retention elections, we conclude that, based upon the three areas of consideration outlined in the *Warwick* case, it is preferable to require Johnstone to run in 1982 than to delay his retention election until 1984 in contravention of the constitution.

Accordingly, the judgment of the superior court is REVERSED.

COMPTON, Justice, concurring in part and dissenting in part.

I believe that the proper interpretation of article IV, section 6, of the Alaska Constitution [1] is that an appointment to a judicial office occurs on the date that the governor informs the new judge of his or her designation to hold office. Accordingly, I agree with this court's conclusion that Judge Johnstone was constitutionally required to

run for retention in the 1982 election, which was the first general election held more than three years after Johnstone's appointment on October 8, 1979.

AS 15.35.070 requires judges to file a declaration of candidacy "not less than 90 days" before the election at which they seek retention. Johnstone did not file his declaration until approximately thirty days before the date of the 1982 election. As a result of this late filing, the judicial council was unable to evaluate him and "provide to the public information about the judge and ... a recommendation regarding retention or rejection," as required by AS 22.10.150. In turn, the judicial council was unable to provide this information to the lieutenant governor's office for inclusion in the election pamphlet distributed to voters, as required by AS 15.58.050.

The majority of this court concludes that, under the particular facts of this case, it is appropriate to "excuse" compliance with these statutes. I disagree. I believe that once this court decides that Johnstone was constitutionally required to run for retention in 1982, and further decides not to "waive" this requirement by giving our interpretation of article IV, section 6, prospective application only, it has no choice but to hold that Johnstone's office was forfeited by reason of his noncompliance with the election laws. *See* Alaska Const. art. IV, § 7.[2] The election laws were promulgated by the legislature because the legislature determined, in the exercise of its sound judgment, that they are necessary. I do not believe this court has presented any legitimate reasons for "excusing" compliance with them.

### I. INELIGIBILITY TO RUN IN 1982

This court has consistently held in the past that pre-election filing deadlines im-

---

1. Article IV, section 6, of the Alaska Constitution provides in relevant part as follows: "Each ... superior court judge shall, in the manner provided by law, be subject to approval or rejection on a nonpartisan ballot at the first general election held more than three years after his appointment."

2. Article IV, section 7, of the Alaska Constitution provides as follows: "*Vacancy.* The office of any supreme court justice or superior court judge becomes vacant ninety days after the election at which he is rejected by a majority of those voting on the question, or for which he fails to file his declaration of candidacy to succeed himself."

posed by statute are mandatory, rather than directive. *State v. Marshall,* 633 P.2d 227, 235 (Alaska 1981); *Silides v. Thomas,* 559 P.2d 80, 86–87 (Alaska 1977).[3] In today's opinion, these authorities are apparently overlooked.

We held in *Silides v. Thomas,* 559 P.2d at 86, that if it is legally impossible to comply with a statute imposing a filing deadline, or if the statute creates significant confusion as to what conduct is required of the candidate, then *substantial compliance* with the statute is sufficient. In that case, the lieutenant governor had rejected Silides' declaration of candidacy for the house of representatives because Silides had not filed his financial disclosure statement within the time prescribed by statute. Although the statute required Silides *to file* his declaration in Anchorage on June 1, we held that the statute would be sufficiently complied with if Silides merely placed his declaration *in the mail* to Anchorage on June 1. On remand, however, the superior court found that Silides had not placed his declaration in the mail until June 2. Accordingly, it affirmed the lieutenant governor's rejection of Silides' declaration because the additional delay of just one day precluded a finding of substantial compliance. 559 P.2d at 82, 85–86.

It is arguable that Johnstone's failure to file a declaration of candidacy within the time period prescribed by AS 15.35.070 was the result of significant confusion as to whether he was required to run for retention in 1982. Even so, however, it cannot be said that Johnstone substantially complied with the statute. AS 15.35.070 requires a candidate to file his declaration more than ninety days before the election. Johnstone did not file his declaration until approximately thirty days before the election. This sixty-day tardiness, amounting to two-thirds of the time period at issue, cannot be construed as substantial compliance.

We indicated in *State v. Marshall* that the sanction of forfeiture of office may not be applicable when violations of the election laws are "technical, trivial, or insubstantial, or could not have affected the election." 633 P.2d at 235. It is apparent, however, that Johnstone's violation of AS 15.35.070 was not merely technical, trivial, or insubstantial; furthermore, it could very well have affected the election.

As a result of Johnstone's late filing, the judicial council was unable to perform the evaluation of him required by AS 22.10.050. The council was also unable to provide the voters with any information in the election pamphlet about Johnstone, or make a recommendation as to whether he should be retained or not. When voters are given less information about a candidate than contemplated by the election laws because of a violation of one of those laws, the violation is considered highly prejudicial and presumed to have affected the election. *See State v. Marshall,* 633 P.2d at 235–36, *Carr v. Thomas,* 586 P.2d 622, 626 (Alaska 1978).

Accordingly, I believe that Johnstone's failure to file his declaration of candidacy until after it was impossible for the judicial council to conduct its evaluation made him ineligible to run in the 1982 election. Unless Johnstone is excused from running in that election, I believe the only proper course is to declare his office forfeited and now vacant.

## II. PROSPECTIVE APPLICATION OF DECISION

This court's resolution of the case is to require Johnstone to run in the 1982 election, while excusing compliance with AS 15.35.070 and AS 22.10.050. In my opinion, this is the worst possible result. If the court wishes to avoid declaring Johnstone's office forfeited, I believe the only way to do so is to give prospective application to our interpretation of article IV, section 6, of the constitution. This would permit Johnstone to participate in the 1984 election, while ensuring compliance with the statutory mandates.

---

**3.** Statutory deadlines for the filing of post-election reports and documents, however, may be directive, rather than mandatory. *See State v. Marshall,* 633 P.2d 227, 234–35 (Alaska 1981).

The rationale ultimately stated by the court for requiring Johnstone to run in the 1982 election and excusing compliance with the relevant statutes is that "[s]election of 1984 as the appropriate year would result in the suspension of the operation of a constitutional mandate, and a denial of the voters' opportunity to retain or reject Judge Johnstone at the precise time prescribed by the constitution." 669 P.2d at 546. The court itself, however, has adequately addressed the latter of these concerns in its opinion. It states that permitting Johnstone to run in 1984 would not "contravene the intent underlying article IV, section 6." *Id.* at 545. The court specifically notes that "[n]o matter how it is construed, article IV, section 6 can operate in the particular case to authorize a first term for a superior court judge of anywhere from three to five years." *Id.* at 545 (footnote omitted). Having thus disposed of this very issue, the court can hardly give much weight to the "denial of the voters' opportunity to retain or reject Judge Johnstone at the precise time prescribed by the constitution." This is particularly so when, until the court rendered its decision in this case, it was unclear what the "precise time prescribed by the constitution" is for a judge to run for retention following his or her "appointment"—the court states that our interpretation of article IV, section 6, is "an issue of first impression whose resolution was not clearly foreshadowed." *Id.* at 544. I therefore do not believe that this rationale supports the court's conclusion.

The other rationale stated for the court's conclusion is its professed concern that selecting 1984 as the year for Johnstone to run for retention would "result in the suspension of the operation of a constitutional mandate." *Id.* at 546. The specific constitutional mandate, however, is as follows: "Each ... superior court judge shall, *in the manner provided by law,* be subject to approval or rejection on a nonpartisan ballot at the first general election held more than three years after his appointment." Alaska Const. art. IV, § 6 (emphasis added). Thus, not only does the constitution require a judge to run for retention "at the first general election held more than three years after his appointment," but it also requires the judge to run for retention "in the manner provided by law." The election laws clearly require a judge to file his or her declaration of candidacy more than ninety days before the election; they further require the judicial council to evaluate the candidate and provide information about the candidate, which is to be included in the voter's pamphlet that is published in accordance with AS 15.58.010.

In its opinion, the court fails to explain why it has chosen to elevate one clause of article IV, section 6, over another. Requiring Johnstone to run in 1982, while excusing compliance with the election laws, results "in the suspension of the operation of a constitutional mandate" that Johnstone run for retention *in the manner provided by law.* By what force of logic is it more important that Johnstone run in 1982, as opposed to 1984, than that the voters have the opportunity to receive from the judicial council information about Johnstone's qualifications before they exercise their franchise, when both are required by the constitution? As the court notes, it is possible for any judge to be in office nearly five years before he or she is required to run for retention. I therefore do not perceive any prejudice resulting from permitting Johnstone to run in 1984. I believe, however, that the prejudice resulting from requiring Johnstone to run in 1982 without the voters receiving necessary information about his qualifications is significant and obvious.

It seems to me that the analysis used by the court supports giving prospective application to our interpretation of article IV, section 6, much more than it supports excusing compliance with the election laws. The court relies upon the test enunciated in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296, 306 (1971), which is indeed the proper test to use when determining whether or not to apply a decision prospectively. In accordance with this test, I believe the court could make a strong argument that our interpre-

tation of article IV, section 6, should only be given prospective application: the proper interpretation of this constitutional provision is "an issue of first impression whose resolution was not clearly foreshadowed," *Chevron, id.* at 106, 92 S.Ct. at 355, 30 L.Ed.2d at 306; retrospective application of our interpretation would not particularly further the purpose and effect of the provision, *id.* at 107, 92 S.Ct. at 356, 30 L.Ed.2d at 306; and finally, retrospective application of our interpretation would arguably produce substantial inequity by causing the forfeiture of Johnstone's office because of his failure to comply with the election laws.[4] *Id.* Accordingly, the circumstances of this case may well justify giving only prospective application to our interpretation of article IV, section 6. As I have repeatedly indicated, this would enable Johnstone to run for retention in 1984, at which time he would be able to comply with the election laws.

Finally, I believe it is necessary to comment upon the court's holding that it may apply the same analysis used to determine whether its decision should be given prospective application to determine instead whether it should excuse the "residual, secondary effects of the decision." 669 P.2d at 543. The court states:

> [W]here a new decision has been rendered on an issue of constitutional law, and where the effect of that decision is to place a litigant in violation of related statutory provisions, application of those statutes may be waived if circumstances exist which would otherwise justify a purely prospective ruling regarding the constitutional issue.

*Id.* at 543. This reasoning is not supported by citation to any authority, presumably because there is none. Although there may be circumstances under which this approach would yield a just result, it is fraught with peril. It may be that prospective application of a particular decision is justified,

while excusing compliance with related statutory provisions is not.

I believe this case presents a perfect example of the problem. In my opinion, the court may be justified in giving prospective application to our interpretation of article IV, section 6. I do not believe, however, that the court is justified in retrospectively applying that interpretation, but excusing compliance with the election laws. The analysis appropriate when determining whether or not to apply a decision regarding a constitutional issue prospectively simply does not address or consider the consequences of waiving the requirements of related statutory provisions. In this case, the court analyzes the facts as it would do if it were considering whether to apply our constitutional ruling prospectively or not. It somehow decides, based on this analysis, that compliance with the election laws may be waived. At no point are the purposes of those election laws addressed, or are the effects of waiving compliance considered. It seems obvious to me that the court simply cannot analyze one issue only to use that analysis to resolve a completely different issue, which was never specifically considered.

## III. CONCLUSION

I agree with the court that the proper interpretation of article IV, section 6, is that a superior court judge must run for retention at the first general election held more than three years after he or she is designated by the governor to hold the office. I therefore agree with the court that Johnstone was constitutionally required to run for retention in the 1982 election. I disagree, however, with the court's conclusion that compliance with the election laws may be waived.

Once the court decides that Johnstone must run in 1982, I believe the only conclu-

---

4. Unlike the situation that would exist if Johnstone had lost at a retention election, *see* AS 22.10.150, if Johnstone's office were declared forfeited because of his failure to comply with the election laws in 1982, he could nonetheless

be appointed immediately to a new office as a superior court judge. Thus, the prejudice sustained by Johnstone if he were "ousted," as the court terms it, may not be as great as assumed.

**550**

sion the court can reach is that Johnstone's office is forfeited and now vacant because he did not file his declaration of candidacy within the time prescribed by AS 15.35.070. If the court wishes to avoid this result, the only analytically sound means by which to do so is to give prospective application to our constitutional interpretation. Using this approach, the court could hold that its decision does not apply to Johnstone. Johnstone accordingly could run for retention in 1984, instead of 1982, at which time compliance with the statutory mandates would be possible.

BURKE, Chief Justice, dissenting.

I respectfully disagree with the majority's conclusion that Judge Johnstone was "appointed," within the meaning of article IV, section 6, on October 8, 1979. In my view, the date of his appointment, for this purpose, was December 14, 1979, the date upon which he took his oath of office.

Governor Hammond's letter of October 8 merely entitled Judge Johnstone to *claim* his office, *Delahay v. State,* 476 P.2d 908 (Alaska 1970), by taking a prescribed oath. Alaska Const. art. XII, § 5; AS 22.10.110. Otherwise, the letter had no particular significance. It did not immediately entitle Judge Johnstone to exercise the powers of a judge, nor did it entitle him to receive the salary and other emoluments of his new office. Between October 8, the date of the letter, and December 14, when he took the oath, Judge Johnstone remained a private citizen, free to decline the governor's "appointment," and free of the benefits and burdens of judicial office. *See, e.g.,* AS 22.10.180 (restricted activities while in office); AS 22.10.10 (compensation); AS 22.-25.020 (retirement pay). His status remained the same until December 14, 1979; on that date he became a judge and Governor Hammond's appointment became a reality.

This view, it seems to me, is also more consistent with Alaska's system of judicial selection and tenure. That system was partly designed to avoid the evils of an elected judiciary. A judge runs for reten-

tion on the basis of his own record while in office, rather than against another candidate. Judge Johnstone's performance as a judge began on December 14, 1979.

For the foregoing reasons I would affirm the judgment of the superior court. As I see it, Judge Johnstone was neither required nor entitled to appear on the 1982 general election ballot. The "first general election held more than three years after his appointment," as I interpret article IV, section 6, is the election that will take place in 1984.